# FIRST NATIONAL CITY BANK *v.* BANCO PARA EL COMERCIO EXTERIOR DE CUBA

No. 81–984.   Argued March 28, 1983—Decided June 17, 1983

612

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined, and in Parts I, II, III–A, and III–B of which BRENNAN, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, and BLACKMUN, JJ., joined, *post*, p. 634.

*Henry Harfield* argued the cause for petitioner. With him on the briefs were *John E. Hoffman, Jr.*, and *Charles B. Manuel, Jr.*

*Richard G. Wilkins* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, Geoffrey S. Stewart, Davis R. Robinson, Fred L. Morrison,* and *Ronald W. Kleinman.*

*Michael Krinsky* argued the cause for respondent. With him on the brief were *Victor Rabinowitz, Judith Levin,* and *Jules Lobel.**

---

*\*John J. McGrath, Jr.*, filed a brief for Kalamazoo Spice Extraction Co. as *amicus curiae* urging reversal.

*Richard F. Bellman* filed a brief for the International Center for Law in Development as *amicus curiae* urging affirmance.

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1960 the Government of the Republic of Cuba established respondent Banco Para el Comercio Exterior de Cuba (Bancec) to serve as "[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity . . . of its own . . . ." Law No. 793, Art. 1 (1960), App. to Pet. for Cert. 2d. In September 1960 Bancec sought to collect on a letter of credit issued by petitioner First National City Bank (now Citibank) in its favor in support of a contract for delivery of Cuban sugar to a buyer in the United States. Within days after Citibank received the request for collection, all of its assets in Cuba were seized and nationalized by the Cuban Government. When Bancec brought suit on the letter of credit in United States District Court, Citibank counterclaimed, asserting a right to set off the value of its seized Cuban assets. The question before us is whether Citibank may obtain such a setoff, notwithstanding the fact that Bancec was established as a separate juridical entity. Applying principles of equity common to international law and federal common law, we conclude that Citibank may apply a setoff.

I

Resolution of the question presented by this case requires us to describe in some detail the events giving rise to the current controversy.

Bancec was established by Law No. 793, of April 25, 1960, as the legal successor to the Banco Cubano del Comercio Exterior (Cuban Foreign Trade Bank), a trading bank established by the Cuban Government in 1954 and jointly owned by the Government and private banks. Law No. 793 contains detailed "By-laws" specifying Bancec's purpose, structure, and administration. Bancec's stated purpose was "to contribute to, and collaborate with, the international trade policy of the Government and the application of the measures concerning foreign trade adopted by the 'Banco Nacional de Cuba,'" Cuba's central bank (Banco Nacional). Art. 1,

No. VIII, App. to Pet. for Cert. 4d. Bancec was empowered to act as the Cuban Government's exclusive agent in foreign trade. The Government supplied all of its capital and owned all of its stock. The General Treasury of the Republic received all of Bancec's profits, after deduction of amounts for capital reserves. A Governing Board consisting of delegates from Cuban governmental ministries governed and managed Bancec. Its president was Ernesto Che Guevara, who also was Minister of State and president of Banco Nacional. A General Manager appointed by the Governing Board was charged with directing Bancec's day-to-day operations in a manner consistent with its enabling statute.

In contracts signed on August 12, 1960, Bancec agreed to purchase a quantity of sugar from El Institutio Nacional de Reforma Agraria (INRA), an instrumentality of the Cuban Government which owned and operated Cuba's nationalized sugar industry, and to sell it to the Cuban Canadian Sugar Company. The latter sale agreement was supported by an irrevocable letter of credit in favor of Bancec issued by Citibank on August 18, 1960, which Bancec assigned to Banco Nacional for collection.

Meanwhile, in July 1960 the Cuban Government enacted Law No. 851, which provided for the nationalization of the Cuban properties of United States citizens. By Resolution No. 2 of September 17, 1960, the Government ordered that all of the Cuban property of three United States banks, including Citibank, be nationalized through forced expropriation. The "Bank Nationalization Law," Law No. 891, of October 13, 1960, declared that the banking function could be carried on only by instrumentalities created by the State, and ordered Banco Nacional to effect the nationalization.

On or about September 15, 1960, before the banks were nationalized, Bancec's draft was presented to Citibank for payment by Banco Nacional. The amount sought was $193,280.30 for sugar delivered at Pascagoula, Miss. On September 20, 1960, after its branches were nationalized,

Citibank credited the requested amount to Banco Nacional's account and applied the balance in Banco Nacional's account as a setoff against the value of its Cuban branches.

On February 1, 1961, Bancec brought this diversity action to recover on the letter of credit in the United States District Court for the Southern District of New York.

On February 23, 1961, by Law No. 930, Bancec was dissolved and its capital was split between Banco Nacional and "the foreign trade enterprises or houses of the Ministry of Foreign Trade," which were established by Law No. 934 the same day.[1] App. to Pet. for Cert. 16d. All of Bancec's rights, claims, and assets "peculiar to the banking business" were vested in Banco Nacional, which also succeeded to its banking obligations. *Ibid.* All of Bancec's "trading functions" were to be assumed by "the foreign trade enterprises or houses of the Ministry of Foreign Trade." By Resolution No. 1, dated March 1, 1961, the Ministry of Foreign Trade created Empresa Cubana de Exportaciones (Cuban Enterprise for Exports) (Empresa), which was empowered to conduct all commercial export transactions formerly conducted by Bancec "remaining subrogated in the rights and obligations of said bank [Bancec] as regards the commercial export activities." App. to Pet. for Cert. 26d. Three hundred thousand of the two million pesos distributed to the Ministry of Foreign Trade when Bancec was dissolved were assigned to Empresa. *Id.*, at 27d. By Resolution No. 102, dated December 31, 1961, and Resolution No. 1, dated January 1, 1962, Empresa was dissolved and Bancec's rights relating to foreign commerce in sugar were assigned to Empresa Cu-

---

[1] Law No. 934 provides that "[a]ll the functions of a mercantile character heretofore assigned to [Bancec] are hereby transferred and vested in the foreign trade enterprises or houses set up hereunder, which are subrogated to the rights and obligations of said former Bank in pursuance of the assignment of those functions ordered by the Minister." App. to Pet. for Cert. 24d.

616

bana Exportadora de Azucar y sus Derivados (Cubazucar), a state trading company, which is apparently still in existence.

On March 8, 1961, after Bancec had been dissolved, Citibank filed its answer, which sought a setoff for the value of its seized branches, not an affirmative recovery of damages.[2] On July 7, 1961, Bancec filed a stipulation signed by the parties stating that Bancec had been dissolved and that its claim had been transferred to the Ministry of Foreign Trade, and agreeing that the Republic of Cuba may be substituted as plaintiff. The District Court approved the stipulation, but no amended complaint was filed.

Apparently the case lay dormant until May 1975, when respondent filed a motion seeking an order substituting Cubazucar as plaintiff. The motion was supported by an affidavit by counsel stating that Bancec's claim had passed through the Ministry of Foreign Trade and Empresa to Cubazucar, all by operation of the laws and resolutions cited above. Counsel for petitioner opposed the motion, and the District Court denied it in August 1975, stating that "to permit such a substitution . . . would only multiply complications in this already complicated litigation." App. 160.

A bench trial was held in 1977,[3] after which the District

---

[2] Citibank's answer alleged that the suit was "brought by and for the benefit of the Republic of Cuba by and through its agent and wholly-owned instrumentality, . . . which is in fact and law and in form and function an integral part of and indistinguishable from the Republic of Cuba." App. 113.

[3] The bulk of the evidence at trial was directed to the question whether the value of Citibank's confiscated branches exceeded the amount Citibank had already recovered from Cuba, including a setoff it had successfully asserted in *Banco Nacional de Cuba* v. *First National City Bank*, 478 F. 2d 191 (CA2 1973) *(Banco I)*, the decision on remand from this Court's decision in *First National City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759 (1972). Only one witness, Raul Lopez, testified on matters touching upon the question presented. (A second witness, Juan Sanchez, described the operations of Bancec's predecessor. App. 185–186.) Lopez, who was called by Bancec, served as a lawyer for Banco Nacional from 1953 to 1965, when he went to work for the Foreign Trade Ministry. He testified that

Court[4] granted judgment in favor of Citibank. 505 F. Supp. 412 (1980). The court rejected Bancec's contention that its separate juridical status shielded it from liability for the acts of the Cuban Government.

> "Under all of the relevant circumstances shown in this record, . . . it is clear that Bancec lacked an independent existence, and was a mere arm of the Cuban Government, performing a purely governmental function. The control of Bancec was exclusively in the hands of the Government, and Bancec was established solely to further Governmental purposes. Moreover, Bancec was totally dependent on the Government for financing and required to remit all of its profits to the Government.
>
> .        .        .        .        .
>
> "Bancec is not a mere private corporation, the stock of which is owned by the Cuban Government, but an agency of the Cuban Government in the conduct of the sort of matters which even in a country characterized by private capitalism, tend to be supervised and managed by Government. Where the equities are so strong in

---

"Bancec was an autonomous organization that was supervised by the Cuban Government but not controlled by it." *Id.*, at 197. According to Lopez, under Cuban law Bancec had independent legal status, and could sue and be sued. Lopez stated that Bancec's capital was supplied by the Cuban Government and that its net profits, after reserves, were paid to Cuba's Treasury, but that Bancec did not pay taxes to the Government. *Id.*, at 196.

The District Court also took into evidence translations of the Cuban statutes and resolutions, as well as the July 1961 stipulation for leave to file a motion to file an amended complaint substituting the Republic of Cuba as plaintiff. The court stated that the stipulation would be taken "for what it is worth," and acknowledged respondent's representation that it was based on an "erroneous" interpretation of Cuba's law. *Id.*, at 207–209.

[4] Judge van Pelt Bryan, before whom the case was tried, died before issuing a decision. With the parties' consent, Judge Brieant decided the case based on the record of the earlier proceedings. 505 F. Supp. 412, 418 (1980).

favor of the counter-claiming defendants, as they are in
this case, the Court should recognize the practicalities of
the transactions. . . . The Court concludes that Bancec
is an *alter ego* of the Cuban Government." *Id.*, at
427–428.

Without determining the exact value of Citibank's assets
seized by Cuba, the court held that "the value of the confis-
cated branches . . . substantially exceeds the sums already
recovered, and therefore the set-off pleaded here may be
granted in full in favor of Citibank." *Id.*, at 467. It there-
fore entered judgment dismissing the complaint.[5]

The United States Court of Appeals for the Second Circuit
reversed. 658 F. 2d 913 (1981). While expressing agree-
ment with the District Court's "descriptions of Bancec's func-
tions and its status as a wholly-owned instrumentality of the
Cuban government," the court concluded that "Bancec was

---

[5] The District Court stated that the events surrounding Bancec's dissolu-
tion "naturally inject a question of 'real party in interest' into the discussion
of Bancec's claim," but it attached "no significance or validity to arguments
based on that concept." *Id.*, at 425. It indicated that when Bancec was
dissolved, the claim on the letter of credit was "the sort of asset, right and
claim peculiar to the banking business, and accordingly, probably should be
regarded as vested in Banco Nacional . . . ." *Id.*, at 424. Noting that the
Court of Appeals, in *Banco I*, had affirmed a ruling that Banco Nacional
could be held liable by way of setoff for the value of Citibank's seized
Cuban assets, the court concluded:

"[T]he devolution of [Bancec's] claim, however viewed, brings it into the
hands of the Ministry, or Banco Nacional, each an *alter ego* of the Cuban
Government. . . . [W]e accept the present contention of plaintiff's counsel
that the order of this Court of July 6th [1961] permitting, but apparently
not requiring, the service of an amended complaint in which the Republic of
Cuba itself would appear as a party plaintiff in lieu of Bancec was based on
counsel's erroneous assumption, or an erroneous interpretation of the laws
and resolutions providing for the devolution of the assets of Bancec. As-
suming this to be true, it is of no moment. The Ministry of Foreign Trade
is no different than the Government of which its minister is a member."
505 F. Supp., at 425 (emphasis in original).

not an alter ego of the Cuban government for the purpose of [Citibank's] counterclaims." *Id.*, at 917. It stated that, as a general matter, courts would respect the independent identity of a governmental instrumentality created as "a separate and distinct juridical entity under the laws of the state that owns it"—except "when the subject matter of the counterclaim assertible against the state is state conduct in which the instrumentality had a key role." *Id.*, at 918. As an example of such a situation the Court of Appeals cited *Banco Nacional de Cuba* v. *First National City Bank*, 478 F. 2d 191 (CA2 1973), in which it had ruled that Banco Nacional could be held liable by way of setoff for the value of Citibank's seized Cuban assets because of the role *it* played in the expropriations. But the court declined to hold that "a trading corporation wholly owned by a foreign government, but created and operating as a separate juridical entity, is an alter ego of that government for the purpose of recovery for wrongs of the government totally unrelated to the operations, conduct or authority of the instrumentality." 658 F. 2d, at 920.[6]

Citibank moved for rehearing, arguing, *inter alia*, that the panel had ignored the fact that Bancec had been dissolved in February 1961. The motion, and a suggestion of rehearing en banc, were denied. This Court granted certiorari. 459 U. S. 942 (1982). We reverse, and remand the case for further proceedings.

## II

## A

As an initial matter, Bancec contends that the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §§ 1602–1611 (FSIA), immunizes an instrumentality owned by a foreign government from suit on a counterclaim based on actions

---

[6] In a footnote, the Court of Appeals referred to Bancec's dissolution and listed its successors, but its opinion attached no significance to that event. 658 F. 2d, at 916, n. 4.

taken by that government. Bancec correctly concedes that, under 28 U. S. C. § 1607(c),[7] an instrumentality of a foreign state bringing suit in a United States court is not entitled to immunity "with respect to any counterclaim . . . to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the [instrumentality]." It contends, however, that as a substantive matter the FSIA prohibits holding a foreign instrumentality owned and controlled by a foreign government responsible for actions taken by that government.

We disagree. The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state. Section 1606 of the FSIA provides in relevant part that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity . . . , the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." The House Report on the FSIA states:

> "The bill is not intended to affect the substantive law of liability. Nor is it intended to affect . . . the attribution of responsibility between or among entities of a foreign state; for example, whether the proper entity of a foreign state has been sued, or whether an entity sued is

---

[7] In relevant part, 28 U. S. C. § 1607 provides:

"In any action brought by a foreign state . . . in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

.    .    .    .    .

"(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state."

As used in 28 U. S. C. § 1607, a "foreign state" includes an "agency or instrumentality of a foreign state . . . ." 28 U. S. C. § 1603(a).

Section 1607(c) codifies our decision in *National City Bank* v. *Republic of China*, 348 U. S. 356 (1955). See H. R. Rep. No. 94–1487, p. 23 (1976).

liable in whole or in part for the claimed wrong." H. R. Rep. No. 94–1487, p. 12 (1976).[8]

Thus, we conclude that the FSIA does not control the determination of whether Citibank may set off the value of its seized Cuban assets against Bancec's claim. Nevertheless, our resolution of that question is guided by the policies articulated by Congress in enacting the FSIA. See *infra*, at 627–628.

## B

We must next decide which body of law determines the effect to be given to Bancec's separate juridical status. Bancec contends that internationally recognized conflict-of-law principles require the application of the law of the state that establishes a government instrumentality—here Cuba—to determine whether the instrumentality may be held liable for actions taken by the sovereign.

We cannot agree. As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. See Restatement (Second) of Conflict of Laws § 302, Comments *a* and *e* (1971). Cf. *Cort* v. *Ash*, 422 U. S. 66, 84 (1975). Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue. See Restatement (Second) of Conflict of Laws, *supra*, § 301.[9] To

---

[8] See also *id.*, at 28 (in deciding whether property in the United States of a foreign state is immune from attachment and execution under 28 U. S. C. § 1610(a)(2), "[t]he courts will have to determine whether property 'in the custody of' an agency or instrumentality is property 'of' the agency or instrumentality, whether property held by one agency should be deemed to be property of another, [and] whether property held by an agency is property of the foreign state").

[9] See also Hadari, The Choice of National Law Applicable to the Multinational Enterprise and the Nationality of Such Enterprises, 1974 Duke L. J. 1, 15–19.

give conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts.[10]   We decline to permit such a result.[11]

Bancec contends in the alternative that international law must determine the resolution of the question presented. Citibank, on the other hand, suggests that federal common law governs.   The expropriation claim against which Bancec

---

[10] Cf. *Anderson* v. *Abbott,* 321 U. S. 349, 365 (1944) (declining to apply the law of the State of incorporation to determine whether a banking corporation complied with the requirements of federal banking laws because "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced").

[11] Pointing out that 28 U. S. C. § 1606, see *supra,* at 620, contains language identical to the Federal Tort Claims Act (FTCA), 28 U. S. C. § 2674, Bancec also contends alternatively that the FSIA, like the FTCA, requires application of the law of the forum State—here New York—including its conflicts principles.   We disagree.   Section 1606 provides that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity . . . , the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."   Thus, where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.   The statute is silent, however, concerning the rule governing the attribution of liability *among* entities of a foreign state.   In *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 425 (1964), this Court declined to apply the State of New York's act of state doctrine in a diversity action between a United States national and an instrumentality of a foreign state, concluding that matters bearing on the Nation's foreign relations "should not be left to divergent and perhaps parochial state interpretations."   When it enacted the FSIA, Congress expressly acknowledged "the importance of developing a uniform body of law" concerning the amenability of a foreign sovereign to suit in United States courts.   H. R. Rep. No. 94–1487, p. 32 (1976).   See *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 489 (1983).   In our view, these same considerations preclude the application of New York law here.

seeks to interpose its separate juridical status arises under international law, which, as we have frequently reiterated, "is part of our law . . . ." *The Paquete Habana*, 175 U. S. 677, 700 (1900). As we set forth below, see *infra*, at 624–630, and nn. 19, 20, the principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies.

## III

## A

Before examining the controlling principles, a preliminary observation is appropriate. The parties and *amici* have repeatedly referred to the phrases that have tended to dominate discussion about the independent status of separately constituted juridical entities, debating whether "to pierce the corporate veil," and whether Bancec is an "alter ego" or a "mere instrumentality" of the Cuban Government. In *Berkey* v. *Third Avenue R. Co.*, 244 N. Y. 84, 155 N. E. 58 (1926), Justice (then Judge) Cardozo warned in circumstances similar to those presented here against permitting worn epithets to substitute for rigorous analysis.

> "The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Id.*, at 94, 155 N. E., at 61.

With this in mind, we examine briefly the nature of government instrumentalities.[12]

---

[12] Although this Court has never been required to consider the separate status of a foreign instrumentality, it has considered the legal status under federal law of United States Government instrumentalities in a number of contexts, none of which are relevant here. See, *e. g.*, *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381 (1939) (determining that

Increasingly during this century, governments throughout · the world have established separately constituted legal entities to perform a variety of tasks.[13]   The organization and control of these entities vary considerably, but many possess a number of common features.   A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law.   The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued.   Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.[14]

These distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally en-

---

Congress did not intend to endow corporations chartered by the Reconstruction Finance Corporation with immunity from suit).

[13] Friedmann, Government Enterprise: A Comparative Analysis, in Government Enterprise: A Comparative Study 303, 306–307 (W. Friedmann & J. Garner eds. 1970).   See D. Coombes, State Enterprise: Business or Politics? (1971) (United Kingdom); Dallmayr, Public and Semi-Public Corporations in France, 26 Law & Contemp. Prob. 755 (1961); J. Quigley, The Soviet Foreign Trade Monopoly 48–49, 119–120 (1974); Seidman, Government-sponsored Enterprise in the United States, in The New Political Economy 83, 85 (B. Smith ed. 1975); Supranowitz, The Law of State-Owned Enterprises in a Socialist State, 26 Law & Contemp. Prob. 794 (1961); United Nations, Department of Economic and Social Affairs, Organization, Management and Supervision of Public Enterprises in Developing Countries 63–69 (1974) (hereinafter United Nations Study); A. Walsh, The Public's Business: The Politics and Practices of Government Corporations 313–321 (1978) (Europe).

[14] Friedmann, *supra*, at 334; United Nations Study 63–65.

joyed by government agencies.[15]   These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.

> "[P]ublic enterprise, largely in the form of development corporations, has become an essential instrument of economic development in the economically backward countries which have insufficient private venture capital to develop the utilities and industries which are given priority in the national development plan.   Not infrequently, these public development corporations . . . directly or through subsidiaries, enter into partnerships with national or foreign private enterprises, or they offer shares to the public."   Friedmann, Government Enterprise: A Comparative Analysis, in Government Enterprise: A Comparative Study 303, 333–334 (W. Friedmann & J. Garner eds. 1970).

Separate legal personality has been described as "an almost indispensable aspect of the public corporation."   *Id.*, at 314.   Provisions in the corporate charter stating that the instrumentality may sue and be sued have been construed to waive the sovereign immunity accorded to many governmental activities, thereby enabling third parties to deal with the instrumentality knowing that they may seek relief in the courts.[16]   Similarly, the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign in

---

[15] President Franklin D. Roosevelt described the Tennessee Valley Authority, perhaps the best known of the American public corporations, as "a corporation clothed with the power of Government but possessed of the flexibility and initiative of a private enterprise."   77 Cong. Rec. 1423 (1933).   See also J. Thurston, Government Proprietary Corporations in the English-Speaking Countries 7 (1937).

[16] *Id.*, at 43–44.   This principle has long been recognized in courts in common-law nations.   See *Bank of United States* v. *Planters' Bank of Georgia*, 9 Wheat. 904 (1824); *Tamlin* v. *Hannaford*, [1950] 1 K. B. 18, 24 (C. A.).

order to facilitate credit transactions with third parties. *Id.*, at 315. Thus what the Court stated with respect to private corporations in *Anderson* v. *Abbott*, 321 U. S. 349 (1944), is true also for governmental corporations:

> "Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Id.*, at 362.

Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee.[17] As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated. Due respect for the actions taken by foreign sovereigns and for principles of comity between nations, see *Hilton* v. *Guyot*, 159 U. S. 113, 163–164 (1895), leads us to conclude—as the courts of Great Britain have concluded in other circumstances[18]—that government

---

[17] See Posner, The Rights of Creditors of Affiliated Corporations, 43 U. Chi. L. Rev. 499, 516–517 (1976) (discussing private corporations).

[18] The British courts, applying principles we have not embraced as universally acceptable, have shown marked reluctance to attribute the acts of a foreign government to an instrumentality owned by that government. In *I Congreso del Partido*, [1983] A. C. 244, a decision discussing the so-called "restrictive" doctrine of sovereign immunity and its application to three Cuban state-owned enterprises, including Cubazucar, Lord Wilberforce described the legal status of government instrumentalities:

"State-controlled enterprises, with legal personality, ability to trade and to enter into contracts of private law, though wholly subject to the control of their state, are a well-known feature of the modern commercial scene. The distinction between them, and their governing state, may appear artificial: but it is an accepted distinction in the law of England and other

instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.

We find support for this conclusion in the legislative history of the FSIA. During its deliberations, Congress clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status. In its discussion of FSIA § 1610(b), the provision dealing with the circumstances under which a judgment creditor may execute upon the assets of an instrumentality of a foreign government, the House Report states:

> "Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a

---

states. Quite different considerations apply to a state-controlled enterprise acting on government directions on the one hand, and a state, exercising sovereign functions, on the other." *Id.*, at 258 (citation omitted).

Later in his opinion, Lord Wilberforce rejected the contention that commercial transactions entered into by state-owned organizations could be attributed to the Cuban Government. "The status of these organisations is familiar in our courts, and it has never been held that the relevant state is in law answerable for their actions." *Id.*, at 271. See also *Trendtex Trading Corp.* v. *Central Bank of Nigeria*, [1977] Q. B. 529, in which the Court of Appeal ruled that the Central Bank of Nigeria was not an "alter ego or organ" of the Nigerian Government for the purpose of determining whether it could assert sovereign immunity. *Id.*, at 559.

In *C. Czarnikow Ltd.* v. *Rolimpex*, [1979] A. C. 351, the House of Lords affirmed a decision holding that Rolimpex, a Polish state trading enterprise that sold Polish sugar overseas, could successfully assert a defense of *force majeure* in an action for breach of a contract to sell sugar. Rolimpex had defended on the ground that the Polish Government had instituted a ban on the foreign sale of Polish sugar. Lord Wilberforce agreed with the conclusion of the court below that, in the absence of "clear evidence and definite findings" that the foreign government took the action "purely in order to extricate a state enterprise from contractual liability," the enterprise cannot be regarded as an organ of the state. Rolimpex, he concluded, "is not so closely connected with the government of Poland that it is precluded from relying on the ban [on foreign sales] as government intervention. . . ." *Id.*, at 364.

judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If U. S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U. S. corporations or between a U. S. corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another." H. R. Rep. No. 94–1487, pp. 29–30 (1976) (citation omitted).

Thus, the presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status is buttressed by this congressional determination. We next examine whether this presumption may be overcome in certain circumstances.

B

In discussing the legal status of *private* corporations, courts in the United States[19] and abroad,[20] have recognized

---

[19] See 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 41 (rev. perm. ed. 1983):

"[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *Id.*, at 389 (footnote omitted).

See generally H. Henn, Handbook of the Law of Corporations § 146 (2d ed. 1970); I. Wormser, Disregard of the Corporate Fiction and Allied Corporation Problems 42–85 (1927).

[20] In *Case Concerning The Barcelona Traction, Light & Power Co.*, 1970 I. C. J. 3, the International Court of Justice acknowledged that, as a matter of international law, the separate status of an incorporated entity may be disregarded in certain exceptional circumstances:

"Forms of incorporation and their legal personality have sometimes not been employed for the sole purposes they were originally intended to serve; sometimes the corporate entity has been unable to protect the rights

that an incorporated entity—described by Chief Justice Marshall as "an artificial being, invisible, intangible, and existing only in contemplation of law" [21]—is not to be regarded as legally separate from its owners in all circumstances. Thus, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other. See *NLRB* v. *Deena Artware, Inc.*, 361 U. S. 398, 402–404 (1960). In addition, our cases have long recognized "the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Taylor* v. *Standard Gas Co.*, 306 U. S. 307, 322 (1939). See *Pepper* v. *Litton*, 308 U. S. 295, 310 (1939). In

---

of those who entrusted their financial resources to it; thus inevitably there have arisen dangers of abuse, as in the case of many other institutions of law. Here, then, as elsewhere, the law, confronted with economic realities, has had to provide protective measures and remedies in the interests of those within the corporate entity as well as of those outside who have dealings with it: the law has recognized that the independent existence of the legal entity cannot be treated as an absolute. It is in this context that the process of 'lifting the corporate veil' or 'disregarding the legal entity' has been found justified and equitable in certain circumstances or for certain purposes. The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or of obligations.

. . . . .

"In accordance with the principle expounded above, the process of lifting the veil, being an exceptional one admitted by municipal law in respect of an institution of its own making, is equally admissible to play a similar role in international law. . . ." *Id.*, at 38–39.

On the application of these principles by European courts, see Cohn & Simitis, "Lifting the Veil" in the Company Laws of the European Continent, 12 Int'l & Comp. L. Q. 189 (1963); Hadari, The Structure of the Private Multinational Enterprise, 71 Mich. L. Rev. 729, 771, n. 260 (1973).

[21] *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636 (1819).

particular, the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies. *E. g., Anderson* v. *Abbott,* 321 U. S., at 362–363. And in *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co.,* 417 U. S. 703 (1974), we concluded:

> "Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. . . . [W]here equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded. . . . [T]he principal beneficiary of any recovery and itself estopped from complaining of petitioners' alleged wrongs, cannot avoid the command of equity through the guise of proceeding in the name of . . . corporations which it owns and controls." *Id.,* at 713 (citations omitted).

## C

We conclude today that similar equitable principles must be applied here. In *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955), the Court ruled that when a foreign sovereign asserts a claim in a United States court, "the consideration of fair dealing" bars the state from asserting a defense of sovereign immunity to defeat a setoff or counterclaim. *Id.,* at 365. See 28 U. S. C. § 1607(c). As a general matter, therefore, the Cuban Government could not bring suit in a United States court without also subjecting itself to its adversary's counterclaim. Here there is apparently no dispute that, as the District Court found, and the Court of Appeals apparently agreed, see 658 F. 2d, at 916, n. 4, "the devolution of [Bancec's] claim, however viewed, brings it into the hands of the Ministry [of Foreign Trade], or Banco Nacional," each a party that may be held liable for the expro-

priation of Citibank's assets. 505 F. Supp., at 425.[22] See *Banco Nacional de Cuba* v. *First National City Bank*, 478 F. 2d, at 194. Bancec was dissolved even before Citibank filed its answer in this case, apparently in order to effect "the consolidation and operation of the economic and social conquests of the Revolution," particularly the nationalization of the banks ordered by Law No. 891.[23] Thus, the Cuban Government and Banco Nacional, not any third parties that may

---

[22] Pointing to the parties' failure to seek findings of fact in the District Court concerning Bancec's dissolution and its aftermath, Bancec contends that the District Court's order denying its motion to substitute Cubazucar as plaintiff precludes further consideration of the effect of the dissolution. While it is true that the District Court did not hear evidence concerning *which* agency or instrumentality of the Cuban Government, under Cuban law, succeeded to Bancec's claim against Citibank on the letter of credit, resolution of that question has no bearing on our inquiry. We rely only on the fact that Bancec was dissolved by the Cuban Government and its assets transferred to entities that may be held liable on Citibank's counterclaim—undisputed facts readily ascertainable from the statutes and orders offered in the District Court by Bancec in support of its motion to substitute Cubazucar.

[23] Law No. 930, the law dissolving Bancec, contains the following recitations:

"WHEREAS, the measures adopted by the Revolutionary Government in pursuance of the Program of the Revolution have resulted, within a short time, in profound social changes and considerable institutional transformations of the national economy.

"WHEREAS, among these institutional transformations there is one which is specially significant due to its transcendence in the economic and financial fields, which is the nationalization of the banks ordered by Law No. 891, of October 13, 1960, by virtue of which the banking functions will hereafter be the exclusive province of the Cuban Government.

"WHEREAS, the consolidation and the operation of the economic and social conquests of the Revolution require the restructuration into a sole and centralized banking system, operated by the State, constituted by the [Banco Nacional], which will foster the development and stimulation of all productive activities of the Nation through the accumulation of the financial resources thereof, and their most economic and reasonable utilization." App. to Pet. for Cert. 14d–15d.

have relied on Bancec's separate juridical identity, would be the only beneficiaries of any recovery.[24]

In our view, this situation is similar to that in the *Republic of China* case.

> "We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice." 348 U. S., at 361–362 (footnote omitted).[25]

Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held by the Court of Appeals to have violated international law.[26] We decline to adhere blindly to the corporate form where doing so would cause such an injustice. See *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co., supra,* at 713.

Respondent contends, however, that the transfer of Bancec's assets from the Ministry of Foreign Trade or Banco Nacional to Empresa and Cubazucar effectively insulates it

---

[24] The parties agree that, under the Cuban Assets Control Regulations, 31 CFR pt. 515 (1982), any judgment entered in favor of an instrumentality of the Cuban Government would be frozen pending settlement of claims between the United States and Cuba.

[25] See also *First National City Bank* v. *Banco Nacional de Cuba,* 406 U. S., at 770–773 (Douglas, J., concurring in result); *Federal Republic of Germany* v. *Elicofon,* 358 F. Supp. 747 (EDNY 1972), aff'd, 478 F. 2d 231 (CA2 1973), cert. denied, 415 U. S. 931 (1974). In *Elicofon,* the District Court held that a separate juridical entity of a foreign state not recognized by the United States may not appear in a United States court. A contrary holding, the court reasoned, "would permit non-recognized governments to use our courts at will by creating 'juridical entities' whenever the need arises." 358 F. Supp., at 757.

[26] See *Banco I,* 478 F. 2d, at 194.

from Citibank's counterclaim. We disagree. Having dissolved Bancec and transferred its assets to entities that may be held liable on Citibank's counterclaim, Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities. To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises. Cf. *Federal Republic of Germany* v. *Elicofon*, 358 F. Supp. 747, 757 (EDNY 1972), aff'd, 478 F. 2d 231 (CA2 1973), cert. denied, 415 U. S. 931 (1974). See n. 25, *supra*. We therefore hold that Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec.

## IV

Our decision today announces no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded.[27] Instead, it is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a

---

[27] The District Court adopted, and both Citibank and the Solicitor General urge upon the Court, a standard in which the determination whether or not to give effect to the separate juridical status of a government instrumentality turns in part on whether the instrumentality in question performed a "governmental function." We decline to adopt such a standard in this case, as our decision is based on other grounds. We do observe that the concept of a "usual" or a "proper" governmental function changes over time and varies from nation to nation. Cf. *New York* v. *United States*, 326 U. S. 572, 580 (1946) (opinion of Frankfurter, J.) ("To rest the federal taxing power on what is 'normally' conducted by private enterprise in contradiction to the 'usual' governmental functions is too shifting a basis for determining constitutional power and too entangled in expediency to serve as a dependable legal criterion"); *id.*, at 586 (Stone, C. J., concurring); *id.*, at 591 (Douglas, J., dissenting). See also Friedmann, The Legal Status and Organization of the Public Corporation, 16 Law & Contemp. Prob. 576, 589–591 (1951).

foreign state to reap the benefits of our courts while avoiding the obligations of international law.[28]

The District Court determined that the value of Citibank's Cuban assets exceeded Bancec's claim. Bancec challenged this determination on appeal, but the Court of Appeals did not reach the question. It therefore remains open on remand. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

Today the Court correctly rejects the contention that American courts should readily "pierce the corporate veils" of separate juridical entities established by foreign governments to perform governmental functions. Accordingly, I join Parts I, II, III–A, and III–B of the Court's opinion. But I respectfully dissent from Part III–C, in which the Court endeavors to apply the general principles it has enunciated. Instead I would vacate the judgment and remand the case to the Court of Appeals for further proceedings.

As the Court acknowledges, the evidence presented to the District Court did not focus on the factual issue that the Court now determines to be dispositive. Only a single witness testified on matters relating to Bancec's legal status and operational autonomy. The record before the District Court also included English translations of various Cuban statutes and resolutions, but there was no expert testimony on the

---

[28] Bancec does not suggest, and we do not believe, that the act of state doctrine, see, *e. g.*, *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398 (1964), precludes this Court from determining whether Citibank may set off the value of its seized Cuban assets against Bancec's claim. Bancec does contend that the doctrine prohibits this Court from inquiring into the motives of the Cuban Government for incorporating Bancec. Brief for Respondent 16–18. We need not reach this contention, however, because our conclusion does not rest on any such assessment.

significance of those foreign legal documents. Finally, as the Court notes, the record includes a July 1961 stipulation of the parties and a May 1975 affidavit by counsel for respondent. *Ante*, at 616–617, n. 3. It is clear to me that the materials of record that have been made available to this Court are not sufficient to enable us to determine the rights of the parties.

The Court relies heavily on the District Court's statement that "the devolution of [Bancec's] claim, however viewed, brings it into the hands of the Ministry [of Foreign Trade], or Banco Nacional." But that statement should not be given dispositive significance, for the District Court made no inquiry into the capacity in which either entity might have taken Bancec's claim. If the Ministry of Foreign Trade held the claim on its own account, arguably the Cuban Government could be subject to Citibank's setoff. But it is clear that the Ministry held the claim for six days at most, during the interval between the promulgation of Laws No. 930 and No. 934 on February 23, 1961, and the issuance of Resolution No. 1 on March 1. It is thus possible that these legal documents reflected a single, integrated plan of corporate reorganization carried out over a 6-day period, which resulted in the vesting of specified assets of Bancec in a new, juridically autonomous corporation, Empresa.[1] Respondent argues

---

[1] Law No. 930 provided, in part, that Bancec's "trade functions will be assumed by the foreign trade enterprises or houses of the Ministry of Foreign Trade," App. to Pet. for Cert. 16d; App. 104. Law No. 934, correspondingly, stated: "All the functions of a mercantile character heretofore assigned to said Foreign Trade Bank of Cuba are hereby transferred and vested in the foreign trade enterprises or houses set up hereunder, which are subrogated to the rights and obligations of said former Bank in pursuance of the assignment of those functions ordered by the Minister." App. to Pet. for Cert. 24d. The preamble of Resolution No. 1 of 1961, issued on March 1, 1961, explained that Law No. 934 had provided "that all functions of a commercial nature that were assigned to the former Cuban Bank for Foreign Trade are attributed to the enterprises or foreign trade houses which are subrogated in the rights and obligations of said Bank." Nothing in the affidavit filed by respondent in May 1975 elucidates the precise nature of these transactions, or explains how Bancec's former trading functions were exercised during the 6-day interval. App. 132–137.

that the Ministry played the role of a trustee, "entrusted and legally bound to transfer Bancec's assets to the new *empresa* [foreign trade enterprise]. . . . The Republic having acted as a trustee, there could be no counterclaim based upon its acts in an individual capacity." Brief for Respondent 57.

Of course, the Court may have reached a correct assessment of the transactions at issue. But I continue to believe that the Court should not decide factual issues that can be resolved more accurately and effectively by other federal judges, particularly when the record presented to this Court is so sparse and uninformative.[2]

---

[2] Nor do I agree that a contrary result "would cause such an injustice." *Ante*, at 632. Petitioner is only one of many American citizens whose property was nationalized by the Cuban Government. It seeks to minimize its losses by retaining $193,280.30 that a purchaser of Cuban sugar had deposited with it for the purpose of paying for the merchandise, which was delivered in due course. Having won this lawsuit, petitioner will simply retain that money. If petitioner's contentions in this case had been rejected, the money would be placed in a fund comprised of frozen Cuban assets, to be distributed equitably among all the American victims of Cuban nationalizations. *Ante*, at 632, n. 24. Even though petitioner has suffered a serious injustice at the hands of the Cuban Government, no special equities militate in favor of giving this petitioner a preference over all other victims simply because of its participation in a discrete, completed, commercial transaction involving the sale of a load of Cuban sugar.