United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 1, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

---

**No. 05-51432**

---

**THE BOARD OF REGENTS OF THE UNIVERSITY**
**OF TEXAS SYSTEM, on behalf of The University**
**of Texas at Austin; HYDRO-QUEBEC,**

                                    **Plaintiffs-Appellees,**

**versus**

**NIPPON TELEPHONE AND TELEGRAPH CORPORATION,**

                                    **Defendant-Appellant.**

---

**Appeal from the United States District Court**
**for the Western District of Texas**
**(1:01-CV-478)**

---

Before BARKSDALE, DeMOSS, and PRADO, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Having removed this action from state court, Nippon Telegraph & Telephone Corporation (NTT), Japan's largest telecommunications company, challenges the district court's denial of its motion to dismiss. In this interlocutory appeal, NTT asserts: it is an "organ of a foreign state", pursuant to the Foreign Sovereign Immunity Act (FSIA), 28 U.S.C. § 1603(b)(2); and, therefore, it is entitled to immunity from federal (and state) court jurisdiction, 28 U.S.C. § 1604. The Board of Regents of the University of Texas System (UT) and Hydro-Québec (HQ) (collectively, UT/HQ) contend this action should be remanded to Texas state court, claiming:

NTT's supplemental removal notice, in which NTT first asserted foreign-sovereign status, was *not* timely filed; and, in the alternative, jurisdiction is lacking because NTT does *not* qualify as an "organ of a foreign state", and, therefore, cannot assert subject-matter jurisdiction under 28 U.S.C. §§ 1330 or 1331.

NTT's supplemental removal notice was timely. But, because NTT does *not* qualify as an "organ of a foreign state", subject-matter jurisdiction is lacking. Accordingly, the district court's denial of foreign-sovereign status is **AFFIRMED**. The Federal Circuit's having earlier rejected NTT's other asserted basis for subject-matter jurisdiction (patent-law, under 28 U.S.C. § 1338(a)), the district court's ruling it has jurisdiction is **VACATED**, and this action is **REMANDED** to district court for remand to Texas state court. **AFFIRMED IN PART; VACATED IN PART; REMANDED.**

I.

UT/HQ alleges: an NTT research scientist learned of confidential information for certain lithium rechargeable-battery technology while visiting the University of Texas at Austin from 1993 to 1994 under the tutelage of a UT professor; upon returning to NTT in Japan, the research scientist disclosed the confidential information, which NTT used in November 1995 to apply for a Japanese patent that was published in May 1997; and, unaware of NTT's misappropriation and patent application, UT filed for a

2

provisional United States patent in April 1996 and entered into a licensing agreement with HQ in January 1997, giving HQ exclusive rights to the lithium rechargeable-battery technology. UT's United States patent was granted in June 1999. UT/HQ asserts NTT's Japanese patent interfered with their ability to commercialize their licensing agreement.

Accordingly, in June 2001, UT/HQ filed this action in Texas state court, claiming, *inter alia*, tortious interference, unfair competition, misappropriation of trade secrets, conversion, and breach of a confidential relationship. The action seeks actual and punitive damages, disgorgement of profits, and a constructive trust over the Japanese patent for the benefit of UT/HQ.

In July 2001, NTT removed this action to district court, pursuant to 28 U.S.C. § 1441, *et seq.* NTT asserted that, because UT/HQ's claims required determining questions of federal patent law, subject matter jurisdiction was proper under 28 U.S.C. §§ 1331 (generally granting jurisdiction over actions arising under federal law) and 1338(a) (providing jurisdiction for claims arising under federal patent laws). Subsequently, believing foreign-sovereign status existed as an additional subject-matter-jurisdiction basis for removal, *see* 28 U.S.C. §§ 1330 and 1441(d), NTT in October 2001 moved for an extension of time to file a supplemental notice of removal. (NTT never asserted diversity jurisdiction pursuant to 28 U.S.C. § 1332 because NTT and H/Q are

3

citizens of foreign states. *E.g.*, **Giannakos v. M/V Bravo Trader**, 762 F.2d 1295, 1298 (5th Cir. 1985) ("Diversity does not exist where aliens are on both sides of the litigation.").)

On 26 November 2001, the district court, *inter alia*, denied UT/HQ's motion to remand for lack of subject-matter jurisdiction. Reasoning that UT/HQ's tortious-interference claim requires determining whether UT/HQ's patent overlaps NTT's patent, the district court held: it had federal-question jurisdiction over that claim, pursuant to 28 U.S.C. §§ 1331 and 1338(a); and, accordingly, it had supplemental jurisdiction over the entire action, pursuant to 28 U.S.C. § 1367(a) ("district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy").

Over the next several years, the parties filed approximately 50 deadline-extension motions. By a June 2004 order, the district court denied, *inter alia*, NTT's motion to dismiss based on sovereign immunity. **Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.**, No. A-01-CA-478 (W.D. Tex. 1 June 2004). Rather than appeal to this court, NTT appealed to the United States Court of Appeals for the Federal Circuit. That court held, contrary to the district court's 26 November 2001 order, that UT/HQ's claims did *not* require the determination of questions arising under federal patent laws. **Bd. of Regents, Univ. of Tex. Sys. v. Nippon**

4

*Tel. & Tel. Corp.*, 414 F.3d 1358, 1365 (Fed. Cir. 2005). Lacking such jurisdiction, the Federal Circuit transferred this appeal to this court: to determine whether NTT properly raised foreign sovereignty as an additional basis for subject-matter jurisdiction; and, if so, to review the district court's denial of NTT's motion to dismiss, claiming foreign-sovereign immunity.

## II.

As a threshold matter, our jurisdiction to review the denial of NTT's motion to dismiss exists under the "collateral order" doctrine, an exception to 28 U.S.C. § 1291's allowing appeals only from final decisions. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-47 (1949). "[R]ecogniz[ing] that the entitlement under the FSIA is an immunity from suit rather than a mere defense to liability ... [which] is effectively lost if a case is erroneously permitted to go [forward]", an interlocutory appeal lies from a denial of foreign-sovereign immunity. *Stena Rederi AB v. Comision de Contratos del Comite*, 923 F.2d 380, 385 (5th Cir. 1991) (internal quotations and citation omitted).

This opinion first addresses whether NTT's supplemental removal notice was timely. Because it was, NTT's foreign-sovereign-status claim is at issue. NTT is *not* entitled to such status; therefore, federal subject-matter jurisdiction is lacking. Accordingly, removal was improper.

## A.

5

NTT filed its initial removal notice on 23 July 2001, having received a copy of UT/HQ's complaint in mid-July. The timeliness of *this* removal notice, which asserted federal-patent questions as the basis for federal jurisdiction, is *not* at issue. Instead, at issue is NTT's *supplemental* removal notice, which asserted foreign-sovereign status as a removal basis. It was submitted with NTT's 15 October motion, which requested an extension of time to file such a supplemental notice. The district court denied that motion on the ground that NTT failed to show cause, pursuant to 28 U.S.C. § 1441(d) ("time limitations [for removal] ... may be enlarged at any time for cause shown"). (As discussed *infra*, because NTT had not yet been properly served with process, its request for an extension of time to file its supplemental notice was *not* necessary.) Relying on 28 U.S.C. § 1447(c), requiring certain *motions to remand* to "be made within 30 days after the filing of the notice of removal", and focusing on considerations of judicial economy, UT/HQ contends this supplemental removal notice was untimely because it was submitted more than 30 days after NTT's initial notice.

UT/HQ's timeliness contention, which implicates subject-matter jurisdiction, is unavailing. We review questions of such jurisdiction *de novo*. **Delgado v. Shell Oil Co.**, 231 F.3d 165, 175 (5th Cir. 2000). The procedure for removal from state to federal court is governed by 28 U.S.C. § 1446(b); it requires a removal

notice to "be filed within thirty days after the receipt by the defendant, *through service or otherwise*, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based ...." 28 U.S.C. § 1446(b) (emphasis added). The Supreme Court clarified this language in **Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.**, 526 U.S. 344, 347-48 (1999), holding the time for removal commences on formal service of process, "*not by mere receipt of the complaint unattended by any formal service*". **Id**. at 348 (emphasis added); *see also* **City of Clarksdale v. BellSouth Telecomms., Inc.**, 428 F.3d 206, 210 (5th Cir. 2005) (summarizing **Murphy Bros.** holding); **Badon v. RJR Nabisco Inc.**, 224 F.3d 382, 390 n.12 (5th Cir. 2000) ("The 30 day period in no event begins to run prior to service of process on the defendant." (citing **Murphy Bros.**)).

In its 26 November 2001 order, the district court determined NTT's mid-July 2001 receipt of UT/HQ's complaint did *not* constitute sufficient service of process, because it did not comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. UT/HQ does *not* contest this ruling. After successfully moving for a time extension, UT/HQ *properly* served NTT on 1 February 2002. Because NTT's supplemental notice of removal was submitted *before* it was properly served with process, the supplemental notice was timely.

B.

7

NTT asserts the FSIA entitles it to foreign-sovereign immunity, pursuant to 28 U.S.C. § 1604: "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States ...." Under the FSIA, "foreign state" includes "an agency or instrumentality of a foreign state", which is defined as any entity:

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an *organ of a foreign state* or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1603(b) (emphasis added).

UT/HQ concedes NTT meets prongs (1) and (3) of § 1603(b). Regarding prong (2), NTT concedes it is neither a political subdivision of, nor majority owned by, the Japanese Government. Therefore, at issue is whether NTT is an "organ" of Japan under § 1603(b)(2). The district court held it is *not*. We agree.

Foreign-sovereign status is a question of law, reviewed *de novo*; underlying findings of fact are reviewed for clear error. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 845 (5th Cir. 2000). Our caselaw has developed a five-factor framework to assist in determining § 1603(b)(2) organ status:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the

8

> hiring of public employees and pays their
> salaries; (4) whether the entity holds
> exclusive rights to some right in the
> [foreign] country; and (5) how the entity is
> treated under foreign state law.

*Id.* at 846-47 (alteration in original) (quoting *Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 379 (E.D. Pa. 1997) (citing *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996))). Cognizant of this court's caveat that these factors should *not* be applied mechanically because there is no "clear test" for determining organ status, we find them apposite here, as did our court in *Kelly*, and as have other circuits in similar cases. *See, e.g., USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003); *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078 (9th Cir. 1999), *withdrawn on other grounds sub nom. Alpha Therapeutic Corp. v. Kyokai*, 237 F.3d 1007 (9th Cir. 2001). Under the *Kelly* factors, NTT does *not* qualify as an "organ" of the Japanese Government.

First, NTT was *not* created for a national purpose. *See Kelly*, 213 F.3d at 846. NTT contends its enabling statute obligates it to provide universal service to Japan. That statute is better understood, however, as prohibiting NTT from unilaterally terminating service to existing customers because, at its inception, NTT held a monopoly it no longer possesses. Along that line, NTT was created to *privatize* what had been a government-controlled monopoly and to promote *competition*. NTT's predecessor,

Nippon Telegraph and Telephone Public Corporation (NTTPC), existed as a *de jure* monopoly; when created in 1985, NTT inherited a *de facto* monopoly. But, as a result of Japan's encouraging competition, NTT now operates as one of several *commercial* interests in a *competitive* telecommunications market. NTT's commercial purpose is further evinced by its now being only 46% Japanese Government-owned, compared to 100% ownership in 1985. Although commercial status does not *per se* preclude finding national purpose, *see, e.g.*, **USX Corp.**, 345 F.3d at 209-13, NTT's creation clearly serves market ends, *not* a government function, such as intervening to prevent "a public financial crisis", *see **id.*** at 211.

Second, the Japanese Government does not *actively supervise* NTT. *See **Kelly***, 213 F.3d at 846. NTT contends Japanese Government authorization is required for numerous NTT transactions, including: appointing or dismissing board members, distributing profits, appointing auditors, issuing new shares, executing mergers, and amending its articles of incorporation. Requiring government authorization, however, is *not active* supervision. Otherwise, *any* regulated public-service provider could claim sovereign status. None of the regulatory powers NTT cites allow the Japanese Government to affirmatively manage NTT affairs; they merely provide passive oversight, related to, and in some cases identical with, the requirements of other governments' regulatory bodies, such as

10

the United States' Securities and Exchange Commission (SEC). Moreover, NTT cites *no* instance of the Japanese Government's exercising its regulatory powers to quash an NTT action. Along this line, NTT reported in an SEC filing: "[T]he [Japanese] Government did not ... intend actively to use its position as a shareholder to direct the management of NTT. The Government has never used its power as a shareholder to direct the management of NTT".

Third, NTT is *not* required to hire public employees. *See Kelly*, 213 F.3d at 846. Indeed, NTT admits its employees are private employees, *not* paid by the Japanese Government. Concomitantly, NTT's non-management employees are members of a private trade union. NTT invites our court to categorize its employees as quasi-civil servants because Japan's Law on Retirement Benefits for National Public Employees provides that employees, who migrate between Japanese Government employment and NTT, receive reciprocal retirement credit. The purpose of this credit, however, is to properly account for NTTPC (and early NTT) employees' years of service, whose employment had been with a Japanese Government entity. NTT's quasi-civil-servant assertion is unavailing.

Fourth, NTT does not "hold[] exclusive *rights* to some right in [Japan]". *See id.* (emphasis added). Lacking any basis to assert exclusive rights, NTT points to its *obligations* to provide universal service and to conduct telecommunications research. Our

having already disposed of NTT's universal-service contention, we note that, as with several of NTT's claims, its research obligation is a historical artifact of its NTTPC origins; NTT was required to continue the research of its public predecessor and to level the competitive playing field by disclosing its findings and licensing its technology to competitors. Moreover, research is *not* a government function; and even an exclusive *obligation* is *not* an exclusive *right*.

Fifth, and finally, NTT is *not* treated as a governmental organ under Japanese law. *See* **id.** at 847. NTT maintains it is similar to Nippon Hoso Kyokai (NHK), a public Japanese television-broadcasting corporation, which the Ninth Circuit held was an organ of the Japanese Government. **Alpha Therapeutic Corp.**, 199 F.3d at 1084-85, *withdrawn on other grounds sub nom.* **Alpha Therapeutic Corp. v. Kyokai**, 237 F.3d 1007 (9th Cir. 2001). Like NHK, NTT is a "designated public institution" under Japan's Disaster Measures Basic Law. **Id.** at 1084. Unlike NHK, which was the only "designated public institution" television station and which Japanese law prohibited from earning profits, **id.**, NTT is *not* the only "designated public institution" telecommunications company and *is* permitted to earn profits and distribute them to shareholders. Furthermore, NTT's funding is not derived from a government-mandated receiver's fee, as was NHK's. **Id.** Finally, while NTT is subject to the World Trade Organization (WTO) Agreement on

12

Government Procurement, it is neither listed in the WTO Agreement as a "government body" of Japan, nor required to abide by the WTO regulations in its "daily profit-making activities".

As stated, consideration of the guiding **Kelly** factors clearly favors concluding NTT is *not* an organ of Japan. Nevertheless, NTT urges its status is similar to the organ status awarded under a claimed broader approach in **Alpha Therapeutic Corp.**, 199 F.3d at 1084; **USX Corp.**, 345 F.3d at 208-13; **Kelly**, 213 F.3d at 847; and **First National City Bank v. Banco para el Comercio Exterior de Cuba**, 462 U.S. 611 (1983) ("**Bancec**"). Each of these cases, however, is readily distinguishable.

Regarding **Alpha Therapeutic Corp.**, in addition to the differences between NHK and NTT already discussed, NHK was required to satisfy specific Government-mandated goals, including promoting Japanese culture, industry, and trade, and providing entertainment to Japanese citizens abroad, 199 F.3d at 1084; NTT serves no such Government purpose. Similarly, unlike **USX Corp.**, in which Ireland acquired complete (even if partially indirect) control over an insurance company to avert disaster in its insurance and banking industries, 345 F.3d at 209-13, NTT is neither completely controlled by Japan nor constituted to prevent national market catastrophe.

Along this line, NTT is distinct from the Syrian oil entity accorded organ status in **Kelly**. 213 F.3d at 848. Syria created

13

that entity for the express national purpose of exploring and developing Syria's mineral interests.  As a result, Syria granted the company the exclusive right to explore and develop Syrian-owned petroleum reserves.  *Id.*  NTT was *not* created for any such national purpose and was *not* granted any such exclusive right.

The last of the decisions under which NTT seeks shelter, **Bancec**, is *not* an FSIA case, but remains persuasive due to its factual similarities and application of federal and international equitable common-law principles.  In **Bancec**, the Supreme Court stated:

> A typical government instrumentality ... is created by an enabling statute ... prescrib[ing] ... manage[ment] by a board selected by the government ...[, is] established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued ... [, and] is run as a distinct economic enterprise ....

462 U.S. at 624.

NTT shares some of these "typical government instrumentality" characteristics, but not others.  More important, however, is **Bancec**'s holding:  the foreign entity at issue was *not* immune from suit in the United States.  Emphasizing that no mechanical formula can consistently and appropriately determine foreign-sovereign status, the Court declared its decision was "the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign

14

[entity] to reap the benefits of our courts while avoiding the obligations of international law". *Id.* at 633-34.

### III.

For the foregoing reasons, NTT is *not* entitled to foreign-sovereign status. Coupled with the Federal Circuit's having found no jurisdiction under federal-patent law, there is no subject-matter jurisdiction. Accordingly, removal was improper.

Therefore, the district court's denial of foreign-sovereign status is **AFFIRMED**; its ruling it has jurisdiction is **VACATED**; and this action is **REMANDED** to district court for remand to Texas state court.

*AFFIRMED IN PART; VACATED IN PART; REMANDED*

15