**Warren T. DEWHURST, et al.**

v.

**TELENOR INVEST AS, et al.**

**No. Civ. CCB–99–417.**

United States District Court,
D. Maryland.

Jan. 24, 2000.

Stephen C. Glassman, Glassman and Bullock Laytonsville, MD, for plaintiffs.

James P. Ulwick, Kramon and Graham, Baltimore, MD, Wendy L. Addiss, Coudert Brothers, Washington, DC, for defendants.

### MEMORANDUM

BLAKE, District Judge.

Now pending before this Court is Defendants' motion to dismiss the complaint or, in the alternative, to stay the proceedings. On February 16, 1999, Plaintiffs Warren Dewhurst, Harry Burks, Jr., Robert Dewhurst, Serguej Domaratskij, Latitudes Trading Company, Inc. ("LTC"), DCI Engineering and Consulting Ltd. ("DCI"), and Neva–Nor Telekom AS ("NNT") filed a complaint with this Court against Defendant Telenor AS, a wholly-owned subsidiary of the government of Norway; Defendants Telenor Invest AS, Telenor International AS, Comet Telecom AS, Comet Holding AS, and Comet Advisors KFT (collectively the "Subsidiary Defendants"); and Defendants Jan Gustav Stenhagen, Arne–Kjetil Lian, and Goran Olson (collectively the "Individual Defendants"). The action stems from a business venture between Warren Dewhurst, Robert Dewhurst,[1] Burks, Domaratskij, LTC, and Telenor Invest AS. These four individuals and two corporations were shareholders in both NNT and a companion corporation, Full–Cry Neva ("FCN").

In June 1993, Warren Dewhurst, Robert Dewhurst, Burks, Domaratskij, and LTC (collectively the "Founders") formed FCN to operate a paging system in St. Petersburg, Russia. In an attempt to obtain additional funding for the corporation, these Plaintiffs reached an agreement with Telenor Invest AS whereby Telenor Invest AS agreed to invest $700,000 into the venture in exchange for a 50 percent ownership in the company. The parties also agreed to establish a new corporation, ultimately NNT, to provide financial and management services to FCN (collectively the "NNT/FCN venture"). The agreement

stated that Telenor Invest AS would likewise receive a 50 percent ownership in NNT. NNT was eventually incorporated in Norway, although much of its business was conducted from Germantown, Maryland.

Plaintiffs' complaint alleges that Telecom AS and the Subsidiary Defendants (collectively the "Corporate Defendants") breached funding, service, and settlement agreements with the Plaintiffs; that the Corporate Defendants breached employment contracts with Burks and Warren Dewhurst; that the Defendants breached fiduciary duties owed to the Plaintiffs; that conduct by Olson and the Corporate Defendants resulted in a tortious interference with contractual relations between the Plaintiffs and outside investors; and that the actions of the Defendants were conducted in bad faith and in breach of the covenants of good faith and fair dealing. On July 13, 1999, the Defendants filed a motion to dismiss the complaint or, in the alternative, to stay the proceedings pending arbitration proceedings that have commenced in Paris, France. The Defendants move to dismiss asserting several challenges to this Court's jurisdiction, as well as other procedural and substantive challenges. For the reasons that follow, this Court holds that it lacks subject matter jurisdiction over any of the claims, and therefore grants the Defendants' motion to dismiss.

### STANDARD OF REVIEW

The Fourth Circuit recently summarized the basic principles governing the resolution of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction:

> The plaintiff has the burden of proving that subject matter jurisdiction exists. When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court is to regard the pleadings as mere evidence on the

---

1. Although both Warren and Robert Dewhurst are shareholders of NNT and Plaintiffs in this action, most of the activities giving rise to this action involve Warren Dewhurst. Therefore, when the Court refers only to "Dewhurst" it is referring to Warren Dewhurst.

issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. The district court should grant the Rule 12(b)(1) motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.1999) (internal citations omitted). While the Fourth Circuit has not addressed the standard of review when the motion to dismiss is based on a claim of foreign sovereign immunity, a district court may need to make a more searching inquiry into the alleged facts before asserting jurisdiction over the foreign state. *See Jungquist v. Sheikh Sultan Bin Khalifa al Nahyan*, 115 F.3d 1020, 1027–28 (D.C.Cir.1997) ("Where the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, however, the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial.") (internal quotations omitted).

## BACKGROUND

Telenor AS is a Norwegian company, all of whose shares are owned by the Government of Norway. (Decl. of Jan Gustav Stenhagen, Defs. Mot., Ex. A ["Stenhagen Decl."], ¶ 9) Until December 1998, Telenor AS owned all of the shares of Telenor International AS, another Norwegian company. (*Id.* at ¶ 9) Telenor International AS, in turn, owned all of the shares of Telenor Invest AS, a company organized under Norwegian law. (*Id.* at ¶ 11) In December 1998, Telenor International AS merged into Telenor Invest AS and, within a few days, the name was changed to Telenor International AS. (*Id.* at ¶ 12 & Ex. 4) Prior to that time, Telenor Invest AS owned all of the shares of two Norwegian corporations, Comet Holding AS and Comet Telecom Advisers Kft ("Comet Advisers Kft"). (Defs.Mot., pp. 3–4) Telenor International AS currently owns all of the shares of both Comet Holding AS and Comet Advisers Kft. (Stenhagen Decl. at ¶¶ 13–14)

In June 1993, the Founders formed FCN to provide paging services in St. Petersburg, Russia. (Pls. Opp'n, p. 4; Aff. of H. Edward Burks, Pls. Opp'n, Ex. 24 ["Burks Aff."], ¶ 3) In early 1994, in an attempt to gain additional funding for their enterprise, the Founders met with representatives for Telenor Invest AS. (Aff. of Warren Dewhurst, Pls. Opp'n, Ex. 23 ["Dewhurst Aff."], ¶ 27) After some preliminary negotiating difficulties, in May 1995, the parties eventually reached an agreement. (*Id.* at ¶¶ 27–35) The parties agreed that Telenor Invest AS would contribute $700,000 to the venture and, in return, would receive a 50 percent ownership in both FCN and a new company to be formed. (Pls. Opp'n, Ex. 9; Stenhagen Decl., ¶ 23)

This new company, eventually named NNT, was to provide financial and management services to FCN. (Def. Mot., p. 5; Stenhagen Decl., ¶ 22) The parties eventually decided on Norway as the place of incorporation for the new company. (*Id.* at ¶ 21; Pls. Opp'n, Exs. 9 & 13) According to the Plaintiffs, "NNT was registered in Norway at the insistence of Telenor Invest AS to facilitate the timeliness of their investment, with the clear understanding that all work performed by employees would be in Germantown, Maryland." (Dewhurst Aff., ¶ 10)

The parties then entered into two shareholders' agreements, one governing FCN ("FCN Shareholders Agreement") and one governing NNT ("NNT Shareholders Agreement") (collectively the "Shareholders Agreements"). (Pls. Opp'n, Exs. 10 & 12) The ownership percentage for each of these companies was the same: Telenor Invest AS, 50 percent; Warren Dewhurst, 22 percent; Domaratskij, 13 percent; Robert Dewhurst, 5 percent; Burks, 5 percent; and LTC, 5 percent. (*Id.*) LTC is a Colorado corporation wholly owned by Robert

Busch, a Norwegian citizen. (*Id.* at p. 3; Stenhagen Decl., ¶ 6) The Shareholders Agreements provided that the parties should "use their best endeavors to settle amicably any dispute, controversy or claim which may arise out of or in connection with [the agreements], but failing results from such efforts, the dispute, controversy or claim shall be settled by arbitration in accordance with the ICC Arbitration Institute Rules." (Pls. Opp'n, Exs. 10 & 12) Stockholm, Sweden, was listed as the site for any such arbitration proceedings. (*Id.*)

On August 30, 1995, Telenor Invest AS and NNT entered into a Consulting Agreement. (*Id.* at Ex. 15) This agreement stated that Telenor Invest AS, designated in the agreement as an "independent contractor," would provide to NNT certain consulting, marketing, and administrative services. (*Id.*) In return, NNT would pay Telenor Invest AS $100,000 per year for marketing and $20,000 per year for accounting and administrative services. (*Id.*) The agreement also provided that it "shall be governed by and construed under the laws of [sic] Norway applicable to contracts made, accepted, and performed wholly within Norway, without application of principles of conflicts of laws." (*Id.*)

To fulfill their marketing obligations under the agreement, Telenor Invest AS appointed a marketing and sales director, Erling Nygaard. (Dewhurst Aff., ¶ 37) Nygaard was subsequently replaced by Busch who developed a Marketing Plan for FCN. (Pls. Opp'n, Exs. 20 & 22) Plaintiffs assert that Olson, a citizen of Sweden, also performed some marketing functions. (*Id.* at p. 7) Olson served as a Board member of both FCN and NNT, and was also an employee of Telenor Invest AS during that period, but claims that he was never an employee of either FCN or NNT. (Decl. of Goran Olson, Defs. Mot., Ex. C ["Olson Decl."], ¶¶ 1 & 7) Plaintiffs contend that, beyond these limited marketing efforts, "Telenor Invest AS's commitment to sales and marketing for NNT effectively ended, despite the requirements of the Consulting Agreement." (Pls.Opp'n, p. 8)

NNT entered into employment agreements with both Dewhurst and Burks. (*Id.* at Exs. 16 & 17) Both agreements were entered into on August 30, 1995, with an effective date of June 1, 1995. (*Id.*) NNT employed Dewhurst as General Director, President, and Chief Executive Officer of the company. (*Id.* at Ex. 16) The company employed Burks as Finance/Administration Director and Chief Financial Officer. (*Id.* at Ex. 17)

Since both Dewhurst and Burks are residents and citizens of Maryland, their work on behalf of NNT is conducted primarily from Germantown, Maryland. (Dewhurst Aff., ¶ 7; Burks Aff, ¶ 5) According to the Plaintiffs, Burks and Dewhurst are the only two NNT employees and, therefore, NNT conducts business exclusively from Maryland. (Dewhurst Aff., ¶¶ 4 & 7) NNT is registered to do business in Maryland as a foreign corporation. (Pls.Opp'n, Ex. 30) NNT maintains a Mailboxes, Etc., address in Maryland and all applicable taxes are paid to the United States or the State of Maryland. (Dewhurst Aff., at ¶¶ 5 & 7) Plaintiffs contend that all goods and services purchased by NNT were paid for from checks written on NNT's Maryland bank account. (Pls. Opp'n, p. 10 & Ex. 31) Finally, NNT purchased parts and equipment from United States vendors. (*Id.* at Ex. 33)

The primary business of NNT, however, is to provide administrative and consulting services to FCN, a corporation selling pagers in Russia. (Burks Aff., ¶ 9) In addition, according to the Defendants, NNT maintains its official books and records in Norway. (Decl. of Arne–Kjetil Lian, Defs. Mot., Ex. B ["Lian Decl."]. ¶ 9) Defendants also assert that most of the NNT Board and shareholder meetings were held in Europe. (Olson Decl., ¶¶ 8 & 22) Dewhurst and Burks attended these meetings. (*Id.* at ¶ 8)

According to the Plaintiffs, around August 1995, the NNT/FCN venture began to

fail. (Pls.Opp'n, p. 11) As a result, on August 30, 1995, Telenor Invest AS agreed to loan NNT $350,000. (*Id.* at Ex. 37) On January 10, 1996, these two parties entered into another loan agreement, this time for $150,000. (*Id.* at Ex. 38) Plaintiffs maintain, however, that Telenor Invest AS "refused to release a portion of the funds, holding hostage $150,000 in 'bridge funds' as leverage to force a stronger equity position for itself in the NNT/FCN Venture." (*Id.* at p. 11)

In January 1996, in an attempt to obtain additional funding from Telenor Invest AS, the Founders agreed to allow NNT and FCN to issue additional shares. (Pls.Opp'n, Exs.41–43) As a result of the agreement, Telenor Invest AS increased its holdings in NNT and FCN from 50 percent to 66.7 percent.[2] In exchange, Telenor Invest AS agreed to donate an additional $350,000 in equity and $750,000 in loans. (*Id.*) Telenor Invest AS also sought to shift NNT's activities away from the United States and toward Russia, although the final agreement involved little geographical change. (*Id.*)

Despite the additional funding, the NNT/FCN venture continued to deteriorate. On February 16, 1996, Olson, the General Director of the Russian office for Telenor Invest AS, and Dewhurst signed a document entitled "Telenor/Neva–Nor/Full Cry–Neva Outline of Agreement 'New Deal'." (Olson Decl., ¶ 20(C) & Ex. 2; Pls. Opp'n, Ex. 48) Plaintiffs contend that the parties intended the New Deal to be a binding agreement. (Pl.Compl., ¶ 21) Olson, on the other hand, asserts that this document "was an outline of points for a new agreement [and] was not intended to be anything more than that and certainly not meant to be a binding agreement." (Olson Decl., ¶ 20(c)(i))

The document stated that "Telenor" would own two-thirds of the shares of FCN and NNT while the Founders would own the remaining one-third of the shares. (Pls.Opp'n, Ex. 48) The document also states that "Telenor" would be able to appoint two Board members for each company while the Founders would be able to appoint one Board member. (*Id.*) The document contained additional information regarding the compensation for Dewhurst and Burks as well as a statement that NNT personnel "continue to be present in St. Petersburg as necessary but not unduly or artificially." (*Id.*) Finally, among the list of things to be done, the document states that Olson and a lawyer need to register FCN's official share certificates. (*Id.*)

By March, Telenor Invest AS began to express an intent to make more dramatic changes to the NNT/FCN venture. A March 21, 1996, fax from Trond Moe, an Area Director for Telenor Invest AS, stated that Telenor Invest AS sought voluntary liquidation of NNT. (Pls.Opp'n, Ex. 45) The fax also stated that the project would be continued through FCN with Domaratskij serving as the General Director. (*Id.*) On April 2, 1996, Telenor Invest AS nominated Adrian Wood and Goran Olson to the FCN Board of Directors, with Wood serving as the Chairman of the Board. (*Id.* at Ex. 53) An April 3, 1996, e-mail from Moe to Dewhurst stated that Moe had stopped the re-registration of FCN's shares because the registration "cannot be done too hastily, and obviously we need to be in total agreement about [the] complete new structure of the company before we start the re-registration." (*Id.* at Ex. 50)

On April 12, 1996, a Business Plan was approved for FCN. (*Id.* at Ex. 54) This plan was signed by Domaratskij, as the General Director for the company, and Wood, Olson, and Dewhurst, as the company's Board members. (*Id.*) The Background section of the Business Plan states that "[e]verybody involved [is] supporting the transfer of authority and responsibility

---

2. According to the Defendants, Telenor Invest AS's ownership percentage in NNT did increase to 66.7 percent, but the increase in ownership of FCN never occurred. (Stenhagen Decl., ¶ 24)

to the Russian management of FCN, and, as a consequence of this, minimal activity and costs in Neva–Nor AS." (*Id.*) An April 28, 1996, fax from Moe confirmed that Telenor Invest AS intended to restructure the venture and that they wanted to eliminate the "US presence of Neva–Nor AS." (*Id.* at Ex. 47)

Adrian Wood, on May 6, 1996, sent a fax to Dewhurst and Domaratskij stating that a "Telenor Board decision of April 16, 1996, supports expansion of FCN" and outlining a plan for FCN recapitalization. (*Id.* at Ex. 57) The fax stated that a new company, Comet Telecom AS, would be created to manage smaller telecommunications projects, such as FCN. (*Id.*) It also stated that, in order to make FCN a Russian business, the Founders' compensation would be changed from a fixed salary to a variable salary.

On June 7, 1996, the Boards of FCN and NNT met in Russia. (*Id.* at Exs. 61–62) Telenor Invest AS converted some of its loans in NNT to shares of the company, and also purchased additional shares in FCN. (*Id.*) Telenor Invest AS then transferred its shares in each company to Comet Telecom AS. (*Id.*) Telenor Invest AS also agreed to assign its loans to Comet Telecom AS, who would then refinance those loan obligations. (*Id.*) The existing Board members for each company resigned and Wood, Olson, and Dewhurst were elected as the new Board members. (*Id.*)

In furtherance of the April 16, 1996, restructuring plan, on June 18, 1996, Dewhurst and Burks agreed to modify their NNT compensation. (*Id.* at Ex. 18) Under this Compensation Modification Agreement, Dewhurst and Burks agreed to accept a "completely variable compensation." (*Id.*) They also agreed "to defer all but 20% of this variable compensation until FCN becomes cash-flow positive." (*Id.*) "Telenor Invest AS/Comet Telecom AS agree[d] and guarantee[d] to maintain sufficient funds in Neva–Nor Telekom AS accounts to ensure the payment of this

20% amount." (*Id.*) According to the Plaintiffs, Telenor Invest AS did not honor either the funding changes or the salary guarantees. (Pls. Compl., ¶¶ 26 & 29) The Defendants, on the other hand, claim that they have provided all of the promised loans. (Stenhagen Aff., ¶ 40(h)) In addition, the Defendants assert that, since FCN was never profitable, Telenor Invest AS did not owe anything under the Compensation Modification Agreement. (*Id.* at ¶ 40(i))

Plaintiffs state that, despite the problems with the NNT/FCN venture, in early 1997, the Board members for NNT and FCN "repeatedly discussed and planned going public." (Dewhurst Aff., ¶ 70) Dewhurst contacted SmithBarney, Inc., and met with their representatives in New York. (*Id.*; Pls. Opp'n, Ex. 64) Plaintiffs contend that Adrian Wood, acting on behalf of Comet Telecom AS, was enthusiastic about this opportunity and contracted with the Strategis Group, a consulting organization, to perform a market analysis. (Dewhurst Aff., ¶ 70) After Dewhurst and Wood contacted an investment bank and law firm regarding the legal aspects of private placement, Wood prepared a "comprehensive recapitalization plan [for the NNT/FCN venture] with a detailed transaction schedule estimating that the value of the shares held by the Founders would be more than US$90 million in two years." (*Id.*)

On April 10, 1997, the Board of Directors for NNT held a meeting in Maryland. The minutes from that meeting state that Wood, Dewhurst, Burks, and Christian Heimeyer, listed as a representative of both Telenor Invest AS and Comet Holding AS, agreed to pursue private placement of shares using the investment banking firm of Daniels & Associates, LP. (Pls.Opp'n, Ex. 72) An April 15, 1997, fax from Wood to Dewhurst outlines the plan for private placement. (*Id.*) Under the plan, the private venture would carry the name "Comet Russia" and would be registered as a Delaware corporation. (*Id.*) In

addition, Dewhurst and Burks would continue as employees of the company but would need to move to Vienna under a three year contract. (*Id.*) A fax sent from Wood to Dewhurst, dated May 15, 1997, continued to discuss the plans for this public offering. (*Id.* at Ex. 76)

In July, however, changes occurred within the Comet Group of companies. A July 4, 1997, fax from Jan Edvard Thygesen, Managing Director of Telenor Invest AS, stated that the duties of Wood and Heimeyer had been taken over by Jan Gustav Stenhagen. (*Id.* at Ex. 79) In addition, as of that day, Stenhagen was appointed as Project Director and was granted full responsibility for the Comet Group. (*Id.*) Wood was eventually fired in October 1997. (Stenhagen Aff., ¶ 85)

Plaintiffs allege that, in July 1997, Olson told Domaratskij that Telenor AS had signed a Strategic Agreement with Telecom Invest. (Affidavit of Serguej Domaratskij, Pls. Opp'n, Ex. 67 ["Domaratskij Aff."], ¶¶ 39–40) Telecom Invest owns NedaPage, the main competitor of FCN. (*Id.* at ¶ 39) Plaintiffs further allege that the goal of this agreement was to merge the Telecom Invest and Telenor Invest AS paging businesses. (Pls.Opp'n, Ex. 81) Plaintiffs state that "[t]he effect of this Strategic Agreement on NNT was devastating, as it directly undermined NNT's ability to proceed with private placement." The Defendants deny that any such agreement between Telecom Invest and Telenor Invest AS was reached. (Defs.Reply, p. 2)

According to the Plaintiffs, on September 23, 1997, Stenhagen, Lian, and the Founders met in Maryland to discuss the future of the NNT/FCN venture. (Dewhurst Aff., ¶ 83) At that meeting, Stenhagen stated that the funding for Comet Russia would not proceed. (*Id.*) Plaintiffs maintain that, since that meeting, Stenhagen and Lian, as the two members of the NNT Board appointed by Comet Holding AS, have blocked any attempt to hold Board meetings or conduct meaningful operations. (*Id.* at ¶ 84)

Finally, in a March 12, 1998, letter, Stenhagen told the Founders that "Telenor has made a strategic decision to go out of paging in the areas where paging does not support a major/core business of ours. This is the case with paging in St. Petersburg." (Pls.Opp'n, Ex. 90) In that letter, Stenhagen offered the Founders the opportunity to purchase the NNT and FCN shares owned by Comet Holding AS. (*Id.*) By May 19, 1998, however, Comet Holding AS apparently changed its position. On that day, a law firm representing Telenor International AS and Comet Holding AS sent a letter to Dewhurst stating that Comet Holding AS was offering to purchase the Founders' shares in NNT and FCN. (*Id.* at Ex. 93) This offer was made conditional on the approval of the Board of Directors for Comet Holding AS and Telenor International AS. (*Id.*)

On May 20, 1998, the Founders responded with a fax stating that they agreed to sell their shares of NNT and FCN. (*Id.* at Ex. 94) In that fax, the Founders state that it was their understanding that they had an agreement with Comet Holding AS. (*Id.*) The Plaintiffs have termed this exchange of facsimiles the "Settlement Agreement." (*Id.* at p. 24) Despite the original offer, Comet Holding AS never purchased the Founders' shares of stock. (Pls.Compl., ¶ 33) Apparently, Comet Holding AS sent the Plaintiffs a letter on August 14, 1998, saying that it was no longer interested in purchasing the Founders' shares. (Pls.Opp'n, Ex. 96) According to the Plaintiffs, the reason given by Comet Holding AS for not purchasing these shares was that it discovered that the shares were not registered in accordance with Russian law. (*Id.*) As mentioned earlier, however, Moe had been the person who chose not to proceed with the registration of these shares. (*Id.* at Ex. 50) These shares are apparently now registered. (*Id.* at Ex. 98; Domaratskij Aff., ¶ 21)

On February 16, 1999, Plaintiffs filed a complaint with this Court alleging breach of several contractual agreements, breach of fiduciary duty, tortious interference with contractual relations, and breach of the covenant of good faith and fair dealing. In that complaint, the Plaintiffs did not specifically allege which Corporate Defendants violated contractual obligations, but instead referred to the Corporate Defendants collectively as "TNI." On June 22, 1999, Telenor International AS and Comet Holding AS commenced an arbitration proceeding in Paris, France, pursuant to the ICC Arbitration Institute Rules. (Decl. of Jens Richard Andersen, Defs.Mot., Ex. D ["Andersen Decl."], ¶¶ 5–6) On July 13, 1999, the Defendants moved to dismiss the Plaintiffs' complaint or, in the alternative, to stay these proceedings pending the arbitration outcome. The Defendants have asserted several challenges to this Court's jurisdiction, as well as a variety of other procedural and substantive challenges.

## ANALYSIS

I. Telenor AS

■ In the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602–1611, Congress provided that foreign states shall be immune from the jurisdiction of federal and state courts, unless one of the exceptions set forth in sections 1605–1607 applies. 28 U.S.C. § 1604. The FSIA also added section 1330(a) to Title 28. That section provides that the district courts shall have original jurisdiction of any claim brought under the FSIA. 28 U.S.C. § 1330(a). Sections 1330(a) and 1604 work in tandem; "§ 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity." *Argentine Republic v. Am-erada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). The FSIA provides the sole basis for federal courts to assert subject matter jurisdiction over claims against a foreign sovereign. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993).

■ Under the FSIA, for most purposes, a " 'foreign state' ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state...." 28 U.S.C. § 1603(a).[3] The term "agency or instrumentality of a foreign state" is defined as any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1603(b). Since Telenor AS is a corporation, all of whose shares are owned by the government of Norway, and is neither a United States citizen nor created under the laws of a third country, all three requirements are met and it qualifies as a foreign state within the meaning of the FSIA. *See Nelson*, 113 S.Ct. at 1477; *In re Tamimi*, 176 F.3d 274, 278 (4th Cir.1999).

■ In every action against a foreign state, the district court's subject matter jurisdiction depends on the existence of one of the specified exceptions to sovereign immunity. *See Nelson*, 113 S.Ct. at 1476. Here, the plaintiffs rely on the commercial activity exception set forth in subsection 1605(a)(2). That subsection provides that a foreign state shall not be immune from suit in the United States in any case:

---

**3.** This explanation of the term "foreign state" does not apply to § 1608 which covers service, timing for answering the complaint, and default judgments. *See* 28 U.S.C. §§ 1603(a) & 1608.

in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Commercial activity unrelated to the lawsuit will not relinquish a foreign state's immunity. Rather, "there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign...." *In re Tamimi*, 176 F.3d at 280 (*quoting Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 386 (5th Cir.1991)).

As the language of section 1605(a)(2) demonstrates, the commercial activity exception incorporates three clauses and the satisfaction of any one of these clauses is sufficient to give a United States court jurisdiction over the foreign state. *See, e.g., Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 2164, 119 L.Ed.2d 394 (1992) (stating that the plaintiffs in that case had relied on the third clause of the commercial activity exception). Plaintiffs have not argued that the activities of Telenor AS have satisfied the first clause, so this Court need only address the second and third clauses of section 1605(a)(2).[4]

## A. Acts Performed in the United States in Connection with a Commercial Activity of the Foreign State Elsewhere

The second clause provides that a foreign state shall not be immune from jurisdiction for an "act performed in the United States in connection with a commercial activity of the foreign state elsewhere...." 28 U.S.C. § 1605(a)(2). The only act that Plaintiffs allege Telenor AS directly performed in the United States was sending Stenhagen to a meeting, held in Chevy Chase, Maryland, on September 23, 1997. At that meeting, Stenhagen purportedly notified the Plaintiffs that Telenor AS would not proceed with funding Comet Russia.

Despite Plaintiffs' assertions, Stenhagen does not appear to have been acting on behalf of Telenor AS. The communications prior to the meeting indicate that Stenhagen was acting on behalf of Telenor Invest AS and the Comet group. *See* Pls. Opp'n, Ex. 86. Dewhurst's own notes at the meeting confirm this indication. *See* Pls. Opp'n, Ex. 104 ("Comet Advisors introduced others," none of whom included Telenor AS). Therefore, contrary to the Plaintiffs' assertions, Stenhagen does not appear to have been acting on behalf of Telenor AS.[5]

Since Telenor AS did not conduct any activities inside the United States, to satis-

---

4. The Plaintiffs do state that they "will show ... how Defendants' activities meet each of these exceptions." Pls. Opp'n., p. 30. But, the Plaintiffs have only argued under the second and third clauses of section 1605(a)(2). Moreover, to meet the requirements of the first clause of the commercial activity exception, Plaintiffs must show that the commercial activity had substantial contact with the United States. *See* 28 U.S.C. § 1603. Here, the commercial activity involved a paging business in Russia and does not have a substantial contact with the United States. *See Nelson*, 113 S.Ct. at 1477–78 (requiring more than a mere casual connection between the acts complained of and the commercial activity carried on in the United States).

5. Even assuming Stenhagen was acting on behalf of Telenor AS, his actions would not satisfy the second clause of the commercial activity exception. To satisfy the second clause, the acts occurring in the United States must have a material connection to some cause of action. *See Stena*, 923 F.2d at 389–90. Here, the Plaintiffs have not alleged that Stenhagen made any decisions at the Chevy Chase meeting. Rather, Stenhagen was merely acting as a messenger. This simple transmission of information is not materially connected to any cause of action. Therefore, even assuming Stenhagen was acting on behalf of Telenor AS, his visit cannot satisfy the second clause of the commercial activity exception.

fy the second clause of the commercial activity exception, the Plaintiffs must attribute the Subsidiary Defendants' actions to Telenor AS. The Supreme Court has stressed that the same presumptions of limited liability and corporate independence that apply to private corporations also apply in addressing corporate status under the FSIA. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983) (*"Banco"*). Although the *Banco* Court's discussion of independent corporate status occurred in a review of substantive liability, those principles have been applied to FSIA jurisdictional inquiries. *See Federal Ins. Co. v. Richard I. Rubin & Co.,* 12 F.3d 1270, 1287 (3d Cir.1993); *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 533 (5th Cir.1992); *Foremost–McKesson, Inc. v. The Islamic Republic of Iran,* 905 F.2d 438, 446–48 (D.C.Cir.1990). *But see Nysa–Ila Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 39 (2d Cir.1993) (holding that a plaintiff must first prove subject matter jurisdiction existed over an agency of a foreign state before the court would consider veil-piercing arguments).

In *Banco,* the Supreme Court cautioned courts against freely disregarding a corporation's separate personality. 103 S.Ct. at 2600. "Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Id.* (*quoting Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944)). But, the Court did recognize that a court may disregard the corporation's separate entity when that "corporate entity is so extensively con-

trolled by its owner that a relationship of principal and agent is created" or where to give effect to the separate entities "would work fraud or injustice." 103 S.Ct. at 2601; *see also Federal Ins. Co.,* 12 F.3d at 1287.

■ Plaintiffs stress that Telenor AS owns all of the shares of its subsidiaries.[6] Plaintiffs also assert that Telenor AS shares directors and officers with Telenor International AS, and some of the subsidiaries also share officers and directors. Stock ownership and the sharing of directors, however, are insufficient grounds in themselves to justify disregarding the corporate form. *See United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 1887–88, 141 L.Ed.2d 43 (1998). It is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* at 1888 (*quoting Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 779 (5th Cir.1997)); *see also Johnson v. Flowers Indus.,* 814 F.2d 978, 982 (4th Cir.1987).

■ The remaining devices of control that Plaintiffs allege are likewise ordinary monitoring functions of parent corporations, and do not justify disregarding the corporate form. Plaintiffs claim that "Telenor AS retained the power to approve investments/loans that are over $7,500,000." Pls. Opp'n, p. 37.[7] Plaintiffs also allege that they were told, by representatives of the Subsidiary Defendants, that the Telenor AS Board had to make decisions regarding the future of Comet Russia. But, the fact that a parent re-

---

6. In actuality, Telenor AS has never owned all of the shares of all of the Subsidiary Defendants. During the time when most of the events giving rise to this litigation took place, Telenor AS owned all of the shares of Telenor International AS. Telenor International AS in turn owned all of the shares of Telenor Invest AS which owned all of the shares of Comet Holding AS and Comet Advisers KFT. As a result of a merger between Telenor Interna-

tional AS and Telenor Invest AS, Telenor AS currently owns all of the shares of Telenor International.

7. But, as Plaintiffs acknowledge, NNT never entered into any funding agreements with Telenor AS, or any of its subsidiaries, that reached that amount.

quires its approval for certain extraordinary loans or ventures does not mean that the parent is controlling the subsidiary. "[T]he exercise of 'oversight' [does not] permit disregard of the incidents of separate corporate entities." *Flowers Indus.,* 814 F.2d at 982; *see also Bestfoods,* 118 S.Ct. at 1889 (relying on traditional corporate principles to hold that a parent should not be held liable for the acts of its subsidiaries when the parent only performs traditional monitoring and financial supervision functions).

Plaintiffs assert that "there is not a single recorded instance of any Telenor AS subsidiary or agent performing, without severe consequences, a single act contrary to the wishes and ultimate shareholding-profit-reaping of Telenor AS." Pls. Opp'n, p. 38. Notably, the Plaintiffs do not cite any evidence supporting this bold statement. The Plaintiffs later state that Wood and Heimeyer, representatives of Telenor Invest AS and Telenor International AS, made positive promises to NNT only to have their employment terminated four days later. Yet Plaintiffs have not stated who fired those representatives or how that firing suggests that Telenor AS controlled its subsidiaries. The exhibits cited by the Plaintiffs likewise shed no light on Plaintiffs' allegations.

 The limited aspects of control exercised by Telenor AS over its subsidiaries does not justify ignoring the separate status of these corporate entities. That does not end the inquiry, however, since the court may pierce the corporate veil if doing so would avoid fraud or injustice. *See Banco,* 103 S.Ct. at 2601. Plaintiffs state that Telenor AS had a policy of doing business in the United States "while using reprehensible means to avoid jurisdiction here at all costs." Pls. Opp'n, p. 40. Yet, the NNT/FCN venture was an undertaking to sell pagers in Russia, and the fact that NNT had a business office in Maryland appears to be more of an accommodation to Burks and Dewhurst then a design by Telenor AS to establish an "alter ego"

acting in Maryland. More importantly, a parent corporation does not automatically submit to jurisdiction in a state simply because a subsidiary conducts business in that state. *See, e.g., Mylan Lab., Inc. v. Akzo, N.V.,* 2 F.3d 56, 63 (4th Cir.1993) (refusing to exercise jurisdiction over a corporation even though its subsidiary conducted business in Maryland).

 Finally, Plaintiffs state that "[i]t appears that Telenor AS refused to provide adequate capitalization to permit its subsidiaries to meet their obligations under the funding agreements or to fund other corporations...." Pls. Opp'n, p. 39. Plaintiffs correctly assert that inadequate funding is a factor to consider in assessing the independent corporate status of a subsidiary. *See In re American Honda Motor Co., Dealerships Relations Litigation,* 941 F.Supp. 528, 552 (D.Md.1996). Plaintiffs' only allegation, however, is that a client of a client of the Comet companies had difficulty collecting payment from those companies. *See* Dewhurst Aff.; ¶ 66. Plaintiffs have not claimed that the Subsidiary Defendants are judgment proof or that they were created so that Telenor AS could avoid its obligations. The fact that a client may have had difficulty collecting from two subsidiaries does not suggest that those companies were severely underfunded so as to justify ignoring their separate corporate form.

Plaintiffs simply have failed to establish that the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or that to give effect to the separate entities "would work fraud or injustice." *Banco,* 103 S.Ct. at 2601. Each of these subsidiaries may be part of a Telenor group of companies. *See* Pls. Opp'n, Ex. 88 (communication, sent by Stenhagen, referring to an action by "Telenor"); *id.* at Ex. 90 (referring to Comet Holding AS as "a Telenor company"). But, the Plaintiffs have not offered any evidence that these subsidiaries ignored corporate formalities or that their daily operations were con-

trolled by Telenor AS. Each of the Corporate Defendants maintain their own separate accounting books and records, as well as conduct their own Board meetings. Plaintiffs have simply not overcome the presumption of separate legal personality, and cannot satisfy their burden by generically referring to the Corporate Defendants as "TNI." *See In re American Honda Motor Co.*, 941 F.Supp. at 536 (plaintiffs' shorthand method for aggregating the corporate defendants could not overcome the presumption of separate legal personality).[8] Since the Plaintiffs have not overcome this presumption, the Court will not consider the contacts of the Subsidiary Defendants in determining jurisdiction. Accordingly, since Telenor AS did not have any direct contacts with the United States, the Plaintiffs have failed to establish jurisdiction under the second clause of the commercial activity exception.

### B. Acts Having a Direct Effect in the United States

The third clause of section 1605(a)(2) requires the Court to consider "whether this lawsuit is (1) 'based ... upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [Norway] outside the country; and (3) that 'cause[d] a direct effect in the United States.'" *Weltover*, 504 U.S. at 611, 112 S.Ct. 2160. Here, since all of the activities of Telenor AS occurred outside the United States, the first requirement has been met. Therefore, the only issues are whether these activities were in connection with a commercial activity and whether they caused a direct effect in the United States.

All of the actions complained of were commercial in nature, a fact that Telenor AS has not disputed. But, the lawsuit must still be "in connection with" those activities, meaning that the acts com-

plained of must have some "substantive connection" or a "causal link" to the commercial activity. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 930 (2d Cir.1998); *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir.1997). Most of the actions that Plaintiffs contend had a direct effect in the United States, however, were actions taken by the Subsidiary Defendants. For example, each of the breach of contract claims are premised on contracts that Plaintiffs entered into among themselves, with the Subsidiary Defendants, or with FCN, a corporation that is not a party to this action. *See, e.g.*, Pls. Opp'n, Ex. 11 (Equipment Rental Agreement between NNT and FCN); *id.* at Ex. 12 (NNT Shareholder Agreement); *id.* at Ex. 15 (Consulting Agreement between NNT and Telenor Invest AS); *id.* at Ex. 16 (Employment Agreement between NNT and Dewhurst); *id.* at Ex. 54 (Business Plan for FCN, signed by FCN Board members). Telenor AS is neither mentioned in, nor a party to, any of these agreements. Similarly, the claims for breach of fiduciary duty are based either on the Subsidiary Defendants' stock ownership or the actions of Stenhagen, Olson, and Lian as directors for NNT.

■ As a result, the only action on behalf of Telenor AS that Plaintiffs contend had a direct effect in the United States is that Telenor AS signed the Strategic Agreement whereby it was contemplated that FCN and Neda Page, one of NNT's competitors, would merge. Count VII of the complaint alleges that this agreement constituted a tortious interference with contractual relations. Therefore, a "substantive connection" exists between the claims alleged and the commercial activity. *Cf. Federal Ins. Co.*, 12 F.3d at 1290–91 (holding that the plaintiffs' claims, stemming primarily from poor construction and maintenance of a building that caught fire, were not

---

**8.** The Agreement on Loan and Liability uses the shorthand "TNI" but specifically states that, for purposes of that agreement, "TNI" refers to Telenor Invest AS. Pls. Opp'n, Ex. 37.

"in connection with" the commercial activity of providing financing for the construction of the building). Accordingly, if the Plaintiffs can show that the signing of the Strategic Agreement had a "direct effect" in the United States, this Court can assert jurisdiction over Count VII of the complaint based on the commercial activity exception.

Plaintiffs, however, cannot make such a showing. The Supreme Court has explained that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *Weltover*, 112 S.Ct. at 2168 (internal quotations omitted). In *Weltover*, the plaintiff bond holders brought a breach of contract action against Argentina and its central bank as a result of Argentina's default on certain bonds issued as part of a plan to stabilize its currency. *Id.* at 2163–64. The Supreme Court affirmed the Second Circuit's finding that a "direct effect" had occurred in the United States. *Id.* at 2168–69. The Court reasoned that, since New York was designated as the place of payment for these bonds, the default "necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 2168.

In affirming the Second Circuit's decision, the *Weltover* Court did not specifically address the Second Circuit's "legally significant acts" test. That test looks to the place of the "legally significant" acts that gave rise to the cause of action in determining where a direct effect may be said to be located. *See Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 999 F.2d 33, 36–37 (2d Cir.1993). Since *Weltover*, the Second Circuit has reaffirmed the application of the "legally significant acts" test, and a number of other circuits have relied on that test in conducting a "direct effects" analysis. *See Antares Aircraft,* 999 F.2d at 36; *Adler,* 107 F.3d at 726–27; *Goodman Holdings v. Rafidain Bank,* 26

F.3d 1143, 1146–47 (D.C.Cir.1994). Thus, in determining whether the signing of the Strategic Agreement had a direct effect in the United States, this Court should consider the location of the acts giving rise to the tortious interference claim.[9]

Here, none of the acts relating to the Strategic Agreement occurred in the United States, nor was the United States contemplated as the place for performance of the agreement. None of the parties to the agreement were United States citizens or résidents. The only effect occurring inside the United States from this agreement was that NNT, a company having a place of business in Maryland, claims to have been adversely affected by the agreement. Such a tangential consequence, however, cannot satisfy the direct effect requirement. As stated by the Second Circuit:

> If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provisions of immunity for foreign states. Many commercial disputes, like the present one, can be pled as the torts of conversion or fraud and would, if appellant is correct, result in litigation concerning events with no connection with the United States other than the citizenship or place of incorporation of the plaintiff.

*Antares Aircraft,* 999 F.2d at 36; *see also Adler,* 107 F.3d at 726–27 ("[M]ere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a direct effect."). The effects alleged by Plaintiffs are simply "too speculative ... remote and attenuated to satisfy the 'direct effect' requirement of the FSIA." *Weltover,* 112 S.Ct. at 2168.

C. The FSIA Exception for the Taking of Property

Section 1605(a)(3) of the FSIA eliminates the sovereign immunity of a foreign state for any case

---

**9.** Without specifically adopting the Second Circuit's "legally significant acts" test, the Court is simply stating that the locus of the events giving rise to the cause of action is relevant to the "direct effects" analysis.

in which rights in property taken in violation of international law are in issue and that property ... is present in the United States in connection with a commercial activity carried on in the United States by a foreign state; or that property ... is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). Plaintiffs assert that "Defendants have essentially expropriated without compensation the property of citizens and subjects of the United States, i.e., NNT and its plaintiff-shareholders, in violation of international law." Pls. Opp'n, p. 42. Plaintiffs claim that such "expropriation" satisfies the requirements of section 1605(a)(3).

The plain language of section 1605(a)(3) requires the foreign state to either "carr[y] on" commercial activity in the United States or be "engaged in" commercial activity in the United States. Since Telenor AS has not conducted any commercial activities in the United States, and since the Subsidiary Defendants are not "foreign states" within the meaning of the FSIA, Plaintiffs have not satisfied the requirements of section 1605(a)(3). Accordingly, since Telenor AS is a "foreign state" within the meaning of the FSIA, and since Plaintiffs have failed to satisfy any of the exceptions to sovereign immunity under the statute, this Court does not have subject matter jurisdiction over the claims brought against Telenor AS.

II. Applicability of the FSIA to the Subsidiary Defendants

Unlike Telenor AS, the Subsidiary Defendants are not directly owned by the Government of Norway. Each of them, however, are intermediate subsidiaries of Norway. In other words, while these Defendants are not directly owned by the Government of Norway, they are all owned by Telenor AS, a company that is directly owned by Norway, or by a subsidiary of Telenor AS. Courts have divided on the issue of whether intermediate subsidiaries are "foreign states" under the FSIA.

The Ninth Circuit has held that intermediate subsidiaries are not foreign states within the meaning of the FSIA. *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461–62 (9th Cir.1995). First, the Court stated that section 1603(a) of the statute provides only that a foreign state "includes" a political subdivision or an agency or instrumentality of a foreign state. *Id.* at 1462. This use of the word "includes" was important to the Ninth Circuit as it suggested that the statute was merely explaining the term foreign state, not defining it. *Id.*

The Court further explained that reading section 1603(a) as defining the term "foreign state" would render the words "political subdivision" in section 1603(b) superfluous. *Id.* Subsection 1603(b)(2) defines an agency or instrumentality as "any entity ... a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." According to the Ninth Circuit, had section 1603(a) been defining a foreign state as "a political subdivision ... or an agency or instrumentality" then it would not need to include the term "political subdivision" in subsection 1603(b)(2); the term "foreign state" in that subsection would already encompass the term "political subdivision." *Gates*, 54 F.3d at 1462.

The Ninth Circuit reasoned that inclusion of both the term "foreign state" and the term "political subdivision" in subsection 1603(b)(2) demonstrates that Congress was not defining "foreign state" in section 1603(a). *Id.* The Court bolstered this conclusion by referencing legislative history which also distinguished between a foreign state and that state's political subdivision. *Id.* Therefore, the Court concluded that section 1603(a) was not defining "foreign state" and that term did not equate to "agency or instrumentality." *Id.* As a result, the fact that an agency or instrumentality of a foreign state owned a majority of the shares of a subsidiary cor-

poration did not make that subsidiary corporation an "agency or instrumentality" within the meaning of section 1603(b). *Id.* A few district courts have agreed with the Ninth Circuit's reasoning. *See Southern Seafood Co. v. Holt Cargo Sys., Inc.*, 1997 WL 539763, at *5 & n. 9 (E.D.Pa. Aug. 11, 1997); *Martinez v. Dow Chemical Co.*, 1996 WL 502461, at *1–2 (E.D.La. Sept.4, 1996). *See also Federal Ins. Co.*, 12 F.3d at 1284 n. 12 (belief, attributed to Judge Greenberg of the Third Circuit, that intermediate subsidiaries were not agencies or instrumentalities of the foreign state, but not addressing the issue because it was not preserved on appeal).

The Seventh Circuit has reached the opposite conclusion. *See In re Air Crash Disaster Near Roselawn, Indiana*, 96 F.3d 932, 939–41 (7th Cir.1996). The Seventh Circuit reasoned that "[t]he plain language of § 1603(a) defines 'foreign state' broadly." *Id.* at 940. The Court criticized the Ninth Circuit's reading of the word "includes" in section 1603(a). *Id.* According to the Seventh Circuit, the use of the word "includes" indicates Congress's intent to broadly define "foreign state." *Id.* This intent, reasoned the Court, was further supported by the legislative history. *Id.*

Therefore, according to the Seventh Circuit, the *Gates* Court relied too heavily upon the redundancy of the term "political subdivision" in subsection 1603(b)(2). *Id.* Instead, any interpretation of the FSIA had to consider the broad definition of "foreign state" and include within that definition an agency or instrumentality of that state. *Id.* Furthermore, as the district court noted in that case, it is

> inconceivable that Congress intended to nullify [the definition of "foreign state" in section 1603(a) ] in the section immediately following it through the roundabout method of including a reference to political subdivision and inviting the reader to rely on the canon of statutory construction expressio unius est exclusio alterius ('Expression of one thing is the exclusion of another').

909 F.Supp. 1083, 1096 (N.D.Ill.1995). The Seventh Circuit, therefore, held that "tiering" was permitted under the FSIA; a subsidiary corporation, a majority of whose shares were owned by an agency or instrumentality of a foreign state, would itself qualify as an agency or instrumentality of that state. 96 F.3d at 940–41. A few district courts have agreed with this reasoning. *See Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F.Supp. 14, 18 n. 5 (D.D.C.1998); *In re Clearsky Shipping Corp.*, 1999 WL 1021825, at *3–5 (E.D.La. Nov.8, 1999).

As these cases demonstrate, relying solely on the language of the statute does not provide a satisfactory resolution of the issue. Either reading of the term "foreign state" creates an inconsistency in a portion of the statute. Under the *Gates* reading of the statute, a court must assume that Congress wanted courts to draw a distinction between "defining" a term and "including" entities within a term. Such a distinction seems unlikely given the language of 28 U.S.C. § 1330(a). In that section, Congress granted subject matter jurisdiction to district courts in actions "against a foreign state as defined in section 1603(a) of this title...." 28 U.S.C. § 1330(a). It seems implausible that Congress would draw a distinction between "defining" and "including" in section 1603(a) and then ignore that distinction in section 1330(a) of the same title. On the other hand, following the *Roselawn* reading of the statute, a court must believe that Congress's repeated references to "political subdivisions" throughout the statute were merely superfluous.

Recognizing this inconsistency, Judge Mukasey for the Southern District of New York broadened the debate by considering the consequences of extending sovereign immunity to intermediate subsidiaries. *See Hyatt Corp. v. Stanton*, 945 F.Supp. 675, 688–90 (S.D.N.Y.1996). Judge Mukasey reasoned that extending coverage to "every subsidiary in a corporate chain, no matter how far down the line, so long as

the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision" would create several results running contrary to Congressional intent. *Id.* at 689 (*quoting Gates,* 54 F.3d at 1462).

First, since under the FSIA plaintiffs do not have a right to a jury trial, "a broad interpretation of the statute would eliminate the plaintiff's right to a jury trial in any suit against a corporation owned by an agency or instrumentality of a foreign state." *Hyatt Corp.,* 945 F.Supp. at 689. Second, since the FSIA provides the sole basis for determining personal jurisdiction over a foreign state, United States courts may not be able to assert jurisdiction over corporations who only are connected to a foreign government through a long chain of parent corporations. *Id.* Finally, since actions involving a foreign state may be removed to federal court, a broad interpretation of the statute would impinge upon a plaintiff's traditional right to choose its forum. *Id.* Based on these concerns, Judge Mukasey held "that a corporation a majority of whose shares are owned by an agency or instrumentality of a foreign state is not itself an agency or instrumentality, and therefore is not a foreign state under the FSIA." *Id.* at 690.

■ The Fourth Circuit has not addressed this issue.[10] I find Judge Mukasey's rationale persuasive and, therefore, hold that a corporation is not deemed an agency or instrumentality of a foreign state simply because a majority of its shares are held by an agency or instrumentality of that state. In addition to the problems cited by Judge Mukasey, other concerns arise from the use of tiering. A corporation directly owned by a foreign government is likely controlled by that government, thereby invoking Congress's

concerns about sovereign immunity. Allowing tiering, however, would extend immunity to corporations far down the chain of ownership, even if these subsidiaries are only remotely controlled by the foreign government.

Moreover, allowing tiering gives these subsidiary corporations a competitive advantage over private companies. These remote corporations receive the procedural protections of the FSIA, as well as potential immunity from suit, that private corporations do not receive. Congress intended such a result for corporations directly owned by foreign states or political subdivisions. *See* 28 U.S.C. § 1603(b)(2). But, to provide this protection to corporations only remotely owned by a foreign government would give the protections of the FSIA to a great number of companies only tangentially controlled by a foreign state.

Finally, following the *Hyatt Corp.* decision does not automatically eliminate protection for subsidiaries whose stock is not directly owned by a foreign state or political subdivision. Subsection 1603(b)(2) is written in the disjunctive. To qualify as an agency or instrumentality, the entity must be "an organ of a foreign state or political subdivision thereof, or [be an entity] a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof. . . ." 28 U.S.C. § 1603(b)(2). If the subsidiary is "an organ of a foreign state or political subdivision thereof," it can receive the protections of the FSIA, regardless of the owner of the subsidiary's shares. As a result, when the subsidiary acts as an instrument of the foreign state, thereby invoking Congress's concerns in passing the FSIA, FSIA protection can attach without the use of tiering. *See Gates,* 54 F.3d at 1460–61 (holding that a commercial enterprise was an "organ" of the state based on the considerable control that a governmen-

---

**10.** In *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315 (4th Cir.1988), the Fourth Circuit treated four corporations, owned by a company that was in turn owned by a foreign state, as foreign states. 863 F.2d

at 317. The parties in that case, however, had agreed that these four companies were foreign states and the Fourth Circuit apparently did not address the issue sua sponte. *Id.*

tal body exercised over that commercial enterprise).

■ Here, the government of Norway does not exercise sufficient control over the Subsidiary Defendants to characterize these Defendants as "organs" of the state. Rather, the record demonstrates that those companies market, manage, and promote through investment various commercial enterprises. Neither side has argued that the Subsidiary Defendants are organs of the government of Norway, and other than the indirect ownership interest discussed earlier, this Court cannot find any connection between the Norwegian government and the Subsidiary Defendants. Accordingly, this Court holds that the Subsidiary Defendants are not agents or instrumentalities of the government of Norway, and therefore are not covered by the FSIA.

III. Applicability of the FSIA to the Individual Defendants

■ The Court's holding that the Subsidiary Defendants are not "agencies or instrumentalities" of a foreign state likewise compels the conclusion that Stenhagen, Lian, and Olson are not agents or instrumentalities of the Government of Norway. Plaintiffs correctly assert that a majority of courts have held that an individual, acting in his official capacity, can qualify under section 1603(b) as an agent or instrumentality of a foreign state. *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027 (D.C. Cir.1997); *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1103 (9th Cir.1990). Stenhagen, Lian, and Olson, however, never acted on behalf of the Government of Norway, nor did they perform any duties for an agency or instrumentality of Norway. Rather, the Individual Defendants were all employees of one or more of the Subsidiary Defendants. As a result, the Individual Defendants were not acting as an "agency or instrumentality of a foreign state" and, consequently, do not qualify as a foreign state under section 1603(a).

Therefore, jurisdiction over these Defendants cannot be obtained through the FSIA. 28 U.S.C. § 1330(a).

IV. Diversity Jurisdiction for the Subsidiary Defendants and the Individual Defendants

■ Since the Subsidiary Defendants and the Individual Defendants are not covered by the subject matter provisions of the FSIA, and since this case does not present a federal question, the Court must determine whether it can assert diversity jurisdiction over this case. *See Schlumberger Indus. v. National Surety Corp.,* 36 F.3d 1274, 1278 & n.6 (4th Cir. 1994) (stating that diversity jurisdiction, federal question jurisdiction, and FSIA jurisdiction are three separate bases for federal subject matter jurisdiction). 28 U.S.C. § 1332(a) grants district courts jurisdiction over civil actions where the matter in controversy exceeds $75,000 and is between:

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a). This statute requires complete diversity among parties so that federal diversity jurisdiction is lacking if there are any litigants from the same state on opposing sides. *See, e.g., Strawbridge v. Curtiss,* 7 U.S. 267, 267, 2 L.Ed. 435 (1806). Similarly, the presence of aliens on both sides of a controversy will defeat diversity jurisdiction. *See, e.g., Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 1570, 143 L.Ed.2d 760 (1999); *Eze v. Yellow Cab Co.,* 782 F.2d 1064, 1065 (D.C.Cir.1986).

In this case, complete diversity is lacking. Both Domaratskij and DCI, Plaintiffs in this case, are citizens of a foreign state.

Similarly, all of the Defendants are citizens or subjects of a foreign state. Therefore, aliens are present on both sides of the controversy and this Court lacks diversity jurisdiction.[11]

Plaintiffs have attempted to avoid this problem by agreeing to dismiss DCI and Domaratskij as parties to this case. Such a dismissal would leave. William Dewhurst, Robert Dewhurst, Burks, LTC, and NNT as plaintiffs. It is undisputed that the Dewhursts, Mr. Burks, and LTC are all citizens of the United States. If the Court finds that NNT is likewise a citizen of the United States, none of the Plaintiffs would be aliens and this Court could exercise diversity jurisdiction pursuant to section 1332(a)(2). The Court must decide, therefore, whether NNT, a company incorporated in Norway but with a principal place of business in Maryland, is a "citizen[ ] or subject[ ] of a foreign state" within the meaning of section 1332(a)(2).

For purposes of determining whether diversity jurisdiction exists, a corporation is a citizen of the State in which it is incorporated and the State in which it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). The Plaintiffs argue, however, that the Court should ignore NNT's "nominal filing of corporate papers in Norway" and, instead, base jurisdiction solely upon NNT's Maryland citizenship. Although the Fourth Circuit has not decided the issue of whether an alien corporation, with its principal place of business in the United States, can be diverse to another alien for jurisdictional purposes, the weight of authority holds that it cannot. *See, e.g., International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 875 F.2d 388, 391–92 (2d Cir.1989); *Chick Kam Choo v. Exx-*

*on Corp.,* 764 F.2d 1148, 1152–53 (5th Cir. 1985); *Rouhi v. Harza Engineering Co.,* 785 F.Supp. 1290, 1292–95 (N.D.Ill.1992). *But see Trans World Hosp. Supplies Ltd. v. Hospital Corp. of America,* 542 F.Supp. 869, 879 (M.D.Tenn.1982). This compelling no compelling reason to treat alien corporations differently from domestic corporations for purposes of subsection 1332(c)(1). "The purpose of [section 1332(c)] was to narrow jurisdiction, not to broaden it." *Chick Kam Choo,* 764 F.2d at 1152.

Plaintiffs' reliance on *Martin Sales & Processing v. West Virginia Dep't of Energy,* 815 F.Supp. 940 (S.D.W.Va. 1993) is misplaced. That Court merely stated that district courts may disregard nominal parties when determining whether diversity jurisdiction exists. *Id.* at 942. NNT, however, is not a nominal party; nearly every cause of action in the complaint involves NNT. Rather, Plaintiffs ask the Court to disregard NNT's alien citizenship. Since the substantial weight of authority and reasoning supports the view that NNT is a citizen of both Norway and Maryland, the Court will not ignore NNT's alien citizenship. Therefore, aliens are present on both sides of the dispute and this Court cannot assert diversity jurisdiction. Accordingly, since the Court does not have subject matter jurisdiction, it must dismiss this case.

A separate Order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

none of the Defendants are United States citizens. Therefore, the Plaintiffs cannot rely on section 1332(a)(3) in seeking diversity jurisdiction. Similarly, since a foreign state is not a plaintiff to this action, Plaintiffs cannot rely on section 1332(a)(4). *See Williams v. Shipping Corp. of India,* 653 F.2d 875, 880 (4th Cir.1981).

---

**11.** A number of courts. have held that section 1332(a)(3) permits a federal court to hear a case involving aliens on both sides of the controversy provided that United States citizens are present on both sides of the controversy and diversity exists between those citizens. *See, e.g., Dresser Indus., Inc. v. Underwriters at Lloyd's of London,* 106 F.3d 494, 497–98 (3d Cir.1997). Here, however,

1. Defendants' Motion to Dismiss is **granted;**

2. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.